**UNITED STATES of America, Plaintiff,**

v.

**CITY OF CHICAGO et al., Defendants.**

**Renault ROBINSON et al., Plaintiffs,**

v.

**James B. CONLISK, Jr., et al., Defendants.**

**Tadeo Robert CAMACHO et al., Plaintiffs,**

v.

**James B. CONLISK, Jr., et al., Defendants.**

**Renault ROBINSON et al., Plaintiffs,**

v.

**William E. SIMON et al., Defendants.**

Nos. 73 C 2080, 70 C 2220, 73 C 1252, 75 C 79.

United States District Court, N. D. Illinois, E. D.

Jan. 5, 1976.

Supplemental Memorandum and Final Decree Feb. 2, 1976.

---

**222**

Philip B. Kurland, Norman J. Barry, Donald E. Egan, Alan L. Unikel, Rothschild, Barry & Myers, Chicago, Ill., for Louis Arado, John Minogue, James O'Neill, Martin Barrett, Richard Pekarek, William Kasniak, Thomas Reilly, Erwin O'Bartuch, Joseph McManus, Michael Chido, intervenor-defendants.

Richard Gutman, Mary L. Sfasciotti, Chicago, Ill., for Carolyn Burauer, Barbara Chiczewski, Sharon Doherty, Bonita Drefs, Frances Jamen, Hattie Knazze, Shirley Stapleton, and Pamela West, intervenor-plaintiffs.

Frank Cicero, Jr., Thomas A. Gottschalk, John P. Wilson, Jr., Gary M. Elden, Kirkland & Ellis, Chicago, Ill., James M. Johnstone, Kirkland, Ellis & Rowe, Washington, D. C., for Renault Robinson, and others.

Donald Pailen, Francis A. Cronin, Elaine C. Afable, Dept. of Justice, Washington, D. C., Ilana Diamond Rovner, Asst. U. S. Atty., Chicago, Ill., for the Government.

William R. Quinlan, Acting Corp. Counsel, Richard J. Phelan, Earl L. Neal, Sp. Counsel, Daniel R. Pascale, Ann Acker, Asst. Corp. Counsel, Jerome A. Siegan, Roseann Oliver, Asst. Corp. Counsel, Chicago, Ill., for the City of Chicago, and others.

Michael L. Meyer, Barry S. Alberts, Schiff, Hardin & Waite, William J. McNally,. Judith Bernstein, Chicago, Ill., for Camacho, and others.

Medard Narko, Lloyd M. Sonenthal, Chicago, Ill., for intervenor-defendants Roy Isakson, Fred Sansone, Robert Buckner, Larry Payne, Martin Leal, George Flood, and others.

Perry L. Fuller, E. Michael Kelly, Hinshaw, Culbertson, Moelmann, Hoban & Fuller, James J. Ahern, Chicago, Ill., for intervenor-defendants Nicholas J. McNamara, John Meade, Thomas W. Toolis, John Hagemann, Richard Kraft, James Moore, Michael J. Connolly, Edward Wodnicki, John F. Kelly, August J. Annerino, Thomas P. McGady, Austin J. Kennedy, Howard A. Knight, Ronald R. Rubin, Paul S. Jankowski, Robert W. Goldsmith, William J. Collins, Nestor W. Chakonas.

## MEMORANDUM DECISION

MARSHALL, District Judge.

The defendants in these complex, consolidated civil rights cases, which involve sexual and racial discrimination in the Police Department of the City of Chicago, are now pursuing their fifth[1] interlocutory appeal to the Court of Appeals for this circuit. We understand that the appeal has been fully briefed and is set for oral argument on January 6. In

---

1. *United States et al. v. City of Chicago et al.,* 74–2048–49, 75–1151, 75–1152, 75–1515 and 75–2073 which is pending.

these circumstances considerations of policy (but not jurisdiction [2]) could suggest that we stay our hand in deciding the merits of the cases until the Court of Appeals has spoken. This is so because while the legal issue on appeal is a narrow one, the propriety of our November 13, 1975 refusal to vacate an earlier order preliminarily enjoining current payments of so-called revenue sharing moneys to the City,[3] the factual issues in the cases are so inextricably interwoven with the legal issues—including that of the revenue sharing cut-off—that guidance beyond that narrow, albeit important, question might be forthcoming from the Court of Appeals. We have concluded, however, that we should not defer our decision on the merits of certain of the issues in the cases.

When the revenue sharing injunction was first entered against the Secretary of the Treasury and others by the District Court for the District of Columbia, the City appealed to the Court of Appeals for this circuit from our refusal to issue a countermanding injunction. It also sought review of the Secretary's decision to comply with the District of Columbia injunction. After the Court of Appeals observed in an unpublished memorandum order that the appeal should have been taken to the Court of Appeals for the District of Columbia,[4] the City dismissed the appeal and its petition for review.

The revenue sharing case was then transferred here on the City's motion under 28 U.S.C. § 1404(a). Upon its arrival, the City requested that we modify or vacate the injunction. After an evidentiary hearing, we adopted the injunction, approved it and refused to vacate or modify it.[5] The City did not appeal that order. Now, truly at the eleventh hour, it has appealed from the denial of an identical motion.

Furthermore, as we noted in denying the City's most recent revenue sharing motion, we have already once postponed this decision on the merits awaiting the results of another narrow interlocutory appeal taken by the Arado intervening defendants who deemed themselves aggrieved by our refusal to enjoin the Police Department's temporary sergeants program which was unilaterally announced by the Department while the cases were in trial on the merits. The briefs in that appeal, while purporting to speak only to the question of our refusal to enjoin the temporary sergeants program, launched a full scale attack on our preliminary injunction findings of fact [6] and then proceeded to argue evidence adduced at the trial on the merits which we had not yet passed upon. Thus, we waited for the Court of Appeals to rule. When it did, it did not get drawn into the thicket of facts. It limited its unpublished memorandum order of affirmance to the matter of the temporary sergeant appointments pointedly observing that "nothing stated herein is intended to have any bearing whatsoever on any issue on the merits now pending before the district court." [7]

Within days of that affirmance, the City was back with its renewed request for interlocutory relief in respect to revenue sharing. When that request was denied, the pending appeal followed.

In light of this record, and in view of the numbers of parties to this action who are represented by separate able counsel, we have concluded that the numbers of potential interlocutory ap-

---

2. The merits of the case remain here. *Ideal Toy Corp. v. Sayco Doll Corp.,* 302 F.2d 623 (2d Cir. 1962).

3. *United States et al. v. City of Chicago et al.,* 405 F.Supp. 480 (N.D.Ill.1975).

4. *United States et al. v. City of Chicago,* 74–2048–49 (7th Cir. Jan. 3, 1975).

5. 395 F.Supp. 329 (N.D.Ill.1975).

6. 385 F.Supp. 543 (N.D.Ill.1974).

7. *United States et al. v. City of Chicago et al.,* 525 F.2d 695, 75–1515 (7th Cir. 1975), p. 6.

peals are limited only by the ingenuity of counsel. Indeed, the next may be triggered by the Department's new method of selecting patrol officers which the parties, the public and the court have awaited since April, 1974.

Additionally, we understand that the City has taken the position in the pending appeal that separate interlocutory relief is warranted because we have unduly delayed our decision on the merits. That argument, having been addressed to the Court of Appeals, is not for us to decide. Suffice it here to observe that the delay has been occasioned in part by the overall history of the case, in part by the size of the task confronting us,[8] in part by our previously noted deference to an earlier interlocutory appeal, and in part by our view expressed in November 1974 that "It is far better in cases of this nature that the remedy come from the parties rather than the court."[9] That view was, in reality, a hope which had been spawned by the City defendants' repeated representations that a new, non-discriminatory, unisex method of selecting patrol officers was in the offing. First made at a pretrial conference held April 10, 1974, the representation was repeated in testimony given by witnesses called by the City defendants during the preliminary injunction hearings held in June of that year (the estimate was then the fall of 1974), urged as a ground for mootness as far as allegations of sex discrimination were concerned, raised again during the hearings relating to revenue sharing in January 1975, again during the trial on the merits held in March-June, 1975, and periodically since then through *in camera* disclosures to the court and counsel, the last of which occurred on October 31, 1975. Still the results of the new method of selection have not been made known.

The delay in the new method of selecting patrol officers has not been our only frustration with respect to a remedy coming from the parties. There was also the arrogant, contumacious refusal by the City defendants to honor their interim hiring agreement and our order approving it of December 16, 1974. When, in the spring of 1975, we were urged by the plaintiffs to proceed against the City defendants for their wilful refusal to abide the terms of that order (which would have recognized the aspirations of at least 500 of the men holding places on the 1971 patrolman's eligibility list), we were importuned by the defendants to stay our hand until the results of the new unisex methods for selecting patrol officers were known. Unwisely, in retrospect, we did just that.[10]

Thus, we have concluded that the time has come for the court to fashion a remedy.

Finally, there is the possibility that the Court of Appeals will find helpful, in its consideration of the issue before it, our findings and conclusions with respect to the merits of the case. Compare, *Silverthorne v. Laird,* 460 F.2d 1175 (5th Cir. 1972). This is particularly so in light of our conclusion that the City defendants have knowingly discriminated against women, blacks and Hispanics in the employment of police officers and that the most effective remedy to cure that constitutional malaise is the economic sanction of withholding revenue sharing funds until those defendants meet the affirmative requirements of a decree entered pursuant to this decision.

For these reasons, then, we proceed to a decision on the merits of all of the principal issues in the cases save racial discrimination in discipline and the essentially private claims raised by the plaintiffs in *Robinson v. Conlisk,* 70 C 2220, at all times cognizant of the superior position, wisdom and objectivity of the Court of Appeals. What follows will stand as our findings of fact and conclu-

8. There have been more than 60 days of testimony, the transcript exceeds 10,000 pages plus hundreds of pages of depositions and of exhibits.

9. 385 F.Supp. 561.

10. 395 F.Supp. 329.

sions of law and reasons for our decision pursuant to Rules 52(a) and 65(d), *Fed.R. Civ.P.* We adopt and incorporate by reference our earlier decisions of April 24, 1974 (*Robinson v. Conlisk,* Ill., 385 F.Supp. 529), April 24, 1974 (*United States v. City of Chicago,* Ill., 385 F.Supp. 540), November 7, 1974 (*United States v. City of Chicago,* Ill., 385 F.Supp. 543), April 21, 1975 (*United States v. City of Chicago,* Ill., 395 F.Supp. 329), and November 13, 1975 (*United States v. City of Chicago,* 405 F.Supp. 480). Because issues will remain to be adjudicated after the entry of the decree pursuant to this memorandum, we find that there is no reason to delay the entry, enforcement of or appeal from that decree and we direct the clerk of this court to enter the decree when it has been presented and signed as a final one pursuant to Rule 54(b), *Fed.R.Civ.P.*

Before turning to the merits, a brief history of the litigation and its parties and the issues is in order.

## I. THE HISTORY OF THE LITIGATION

The litigation originated on September 9, 1970 with the complaint of Renault Robinson and the Afro-American Patrolmen's League against the City, James B. Conlisk, Jr., who was then the City's Superintendent of Police, and the members of the City's Police Review Board. 70 C 2220. Robinson is a black Chicago Police Officer and the League is composed of black Chicago Police Officers. The complaint alleged violations of plaintiffs' First, Fifth, Thirteenth and Fourteenth Amendment rights and sought relief under 42 U.S.C. §§ 1981 and 1983, 28 U.S.C. § 1343(3) and 28 U.S.C. § 1331. The action was first assigned to Judge Parsons, who recused himself,[11] reassigned to Judge Marovitz and then to Judge McGarr. During its pendency before Judge McGarr, the case moved through a series of contested discovery proceedings and motions addressed to the pleadings. On April 11, 1973 plaintiffs filed their second amended complaint. Defendants moved to dismiss or alternatively for summary judgment. That motion was denied by Judge McGarr in an opinion filed September 19, 1973.

On May 13, 1973 Tadeo Robert Camacho and others, Hispanic and black who had sought appointment as Chicago Police Officers, filed their complaint against the City, Conlisk, the members of the Civil Service Commission of the City and Charles A. Pounian, the Secretary of the Commission. 73 C 1252. Alleging discrimination in employment in violation of their Fourteenth Amendment and statutory rights, plaintiffs sought relief under 42 U.S.C. §§ 1981, 1985, 2000d *et seq.* and 2000e *et seq.* The action was assigned to Judge Parsons, where it remained, moving through some discovery and a denial of defendants' motion to dismiss.

On August 14, 1973, the United States of America filed its complaint against the City, Conlisk[12] and the Civil Service Commission of the City. 73 C 2080. The Government alleged a pattern and practice of racial and sexual discrimination by the defendants in respect to employment, promotion, assignment and discipline in the Police Department, all in violation of Title VII of the Civil Rights Act of 1964, as amended by the Equal Employment Opportunity Act of 1972, 42 U.S.C. § 2000e *et seq.,* the Fourteenth Amendment and 42 U.S.C. §§ 1981 and 1985, and later, by amendment, the State and Local Fiscal Assistance Act of 1972, 31 U.S.C. §§ 1221 *et seq.* It also sought enforcement of the regulations and guidelines of the Department of Justice and the Law Enforcement Assistance Administration, 28 C.F.R. 42.201 *et seq.* and 42.301 *et seq.* The action was assigned to Judge McMillen as related to an earlier action

---

11. Minute Order of September 24, 1970.

12. James Rochford as Superintendent was substituted for Conlisk on March 14, 1974 in

73 C 2080 and as the memberships of the defendant Board and Commission have changed, appropriate substitutions have been made.

brought by the United States against the City alleging similar discrimination in the City's fire department. While the action was pending before Judge McMillen it was moving very swiftly toward a hearing on plaintiff's motion for a preliminary injunction.

On September 27, 1973, the Robinson case, 70 C 2220, was reassigned here from Judge McGarr as a part of our initial calendar. We called the parties in for a status report and directed them to resume their discovery. Shortly thereafter the Camacho plaintiffs in 73 C 1252, and the Government in 73 C 2080 filed statements with the Executive Committee of this court pursuant to our Local Rule 10 B 4 that their cases were related to 70 C 2220 and should be reassigned here. Some delay was experienced in respect to the reassignments but ultimately orders to that effect were entered and those two cases came here on February 15 and 20, 1974. We promptly convened a joint pretrial conference on March 5, 1974, at which we requested the parties to consider consolidation of the actions and stated our desire to proceed with the hearing on the motion for a preliminary injunction in the Government's case, 73 C 2080, on May 6, 1974, the date which had been scheduled by Judge McMillen.

The City defendants then moved for reconsideration of Judge McGarr's opinion and order denying their motion to dismiss or for summary judgment in the Robinson case, 70 C 2220. Briefs were filed. We reconsidered the motion and denied it on April 24, 1974. 385 F.Supp. 529.

The plaintiffs in the three cases jointly moved to consolidate them. The City defendants opposed the motion insisting that separate trials were required despite the fact that the cases had come here as related because they all involved allegations of employment discrimination in the Chicago Police Department. The motion to consolidate was granted. 385 F.Supp. 540.

On April 10, 1974 a consolidated pretrial conference was held regarding the hearing on the motion for preliminary injunction. At that conference defendants suggested that the need for a preliminary hearing was doubtful because they were at work on a new unisex method of selecting patrol officers.

The evidentiary hearing on plaintiffs' motion for a preliminary injunction in the consolidated action commenced on May 30, 1974, pursuant to Rule 65(a)(2), Fed.R.Civ.P., i. e., it was consolidated with the trial on the merits. On the eve of that hearing, Louis Arado, et al., who hold places on the 1973 sergeants promotion list, were granted leave to intervene as defendants with the consent of the City defendants. Henceforth, where appropriate, the City of Chicago and its several officers and employees will be referred to as the City defendants and the Arado defendants will be so designated. In addition, subsequent intervenors will be appropriately designated.

The preliminary injunction hearing consumed 17 trial days; testimony was concluded June 28, oral arguments were heard July 11, and thereafter the parties filed extensive written briefs in which the City defendants urged, *inter alia,* that the issue of sex discrimination was moot because, as their witnesses had testified, the new unisex method of selecting patrol officers would be ready by the fall of 1974.

On June 28 a consent decree settling certain height, weight, vision and medical requirements was entered. On November 7, 1974 we filed an opinion and issued a preliminary injunction directed particularly at the uncontroverted showing of discrimination against women, the 1971 patrolman's roster and the 1973 sergeants promotion list. 385 F.Supp. 543. Shortly thereafter we set the consolidated action for trial on the merits to commence January 6, 1975.

All of the defendants appealed from the preliminary injunction order. Subsequently they dismissed their appeals.[13]

**13.** *United States et al. v. City of Chicago et al.,* 75–1151 (7th Cir. Apr. 25, 1975); *United States et al. v. City of Chicago,* 75–1152 (7th Cir. May 21, 1975).

On December 16, 1974, after extensive negotiations among the parties, plaintiffs and the City defendants agreed to an interim hiring program under which the City could appoint 600 patrol officers—500 from the 1971 patrolman's roster and 100 from a police matron roster. After hearings in open court, we approved that agreement and incorporated it into an interim hiring order. In doing so we noted the City's professed need for police officers and the fact that the remedy was coming from the parties, rather than the court. At the same time, in part because appeals were pending from the preliminary injunction order, in part to meet the convenience of the parties and in part because of the anticipated new "unisex" method of selecting patrol officers, we continued the trial on the merits to March 1975.

On February 7, 1974, just before the consolidated cases had arrived on our calendar, Renault Robinson, the Afro-American Patrolmen's League and the National Association for the Advancement of Colored People had commenced an action in the United States District Court for the District of Columbia against the Secretary of the Treasury and officials of the Office of Revenue Sharing (hereafter the ORS defendants). Plaintiffs alleged that the racially discriminatory practices of the City's Police Department, to which a major portion of the City's revenue sharing allotments had been allocated, violated Section 122(a) of the State and Local Assistance Act of 1972, 31 U.S.C. § 1242(a), and they sought injunctive relief in respect thereto. The history of that action has been reported in our memorandum decision of April 21, 1975, 395 F.Supp. 329, and need not be repeated here.

On December 18, 1974, the District Court for the District of Columbia acting in light of our preliminary injunction of November 7, enjoined the ORS defendants from making further revenue sharing payments to the City until it had complied with a final order of this court. There followed a frenzy of maneuvers by the City which included a collateral attack here on the District of Columbia order,[14] an appeal to the Court of Appeals for this Circuit and the City's unilateral repudiation of the interim hiring agreement and order. Ultimately the District of Columbia action was transferred here on the City's motion, docketed at 75 C 79 and consolidated with the other actions. The result is that the Government finds itself in the anomalous position of being a plaintiff as to certain of the revenue sharing issues in the case and a defendant as to others. As we shall see, it has not entirely reconciled that dilemma.

It was about this time that Carolyn Burauer, et al., requested and were granted leave to intervene as plaintiffs. Ms. Burauer and her colleagues aspired to be patrol officers. They sought to represent the particularized views of women who had been discriminated against by the Police Department. They will be referred to as the Burauer plaintiffs.

Then came Roy Isakson, et al., who hold places on the 1971 patrolman roster. They were granted leave to intervene as defendants upon the condition that they dismiss a spate of state and federal court actions they had brought which, in effect, were collateral attacks on the November 7 preliminary injunction. The Isakson defendants' activities here have included, *inter alia,* the presentation of some 615 petitions bearing thousands of signatures "to hire the 1500 [on the 1971 patrolman roster]." Initially they aligned themselves with the City defendants. By the conclusion of the trial, however, they seemingly had joined forces with the plaintiffs for in their brief they urge a permanent injunction against "the use of the type of exams, physicals and procedures used [in respect to patrolmen] in 1971," the "full implementation of the interim hiring order" and "ratio . . . minority hiring in all prospective hiring." Br. of Isakson Defendants, p. 6.

14. Hearings were held on December 18, 19, 23 and 26, 1974.

In February, 1975, as the time for trial approached, it was discovered that the City defendants had falsely answered an interrogatory served upon them by the Robinson plaintiffs in 1971. The interrogatory had called for information relating to Department surveillance of Robinson and other offices of the League. The answer was:

> Department records reveal no surveillance has ever been conducted on Renault Robinson, or any other officer of the Afro-American Patrolmen's League.

Then in February, massive surveillance files were discovered—dating back to 1968—at least to the extent that they had not been destroyed by the City defendants in 1974, long after all of the actions had been pending and the interrogatories answered. But, we were told, the surveillance files were extraordinary sensitive and we were urged by the City's counsel in an *ex parte, in camera* conference to inspect them and use our restraint in ordering their disclosure. Inspect them we did—two brief cases full—and all of them pertained to Robinson and the League. While they contained large quantities of newspaper clippings and memoranda relating to surveillance of public meetings and testimonials at which Robinson and other League members were in attendance, they also contained appraisals and opinions of Robinson and the League which were clearly relevant to their claims here.

And then, on the eve of the trial on the merits, Nicholas J. McNamara, et al., who hold places on the 1970 lieutenants promotion roster were granted leave to intervene as defendants. They, too, have aligned themselves with the City defendants, but unlike the Isakson defendants, who appear to have changed their stance, or the Arado defendants, who have taken it upon themselves to defend not only the 1973 sergeants roster but the 1971 selection of patrolmen as well, the McNamara defendants have limited their efforts to defending the 1970 lieutenants roster and its underlying examination. As will appear in due course, they have succeeded.

The trial on the merits commenced on March 10. On that day, the City defendants announced unilaterally, without notice to the parties or leave of court, the promotion of 16 sergeants to the office of lieutenant, the program for the promotion of temporary sergeants and a new written examination for patrol officers. Each announcement provoked motions by all of the remaining parties, except the McNamara defendants, for preliminary injunctions restraining the proposed actions. On June 6, the motions were denied following extensive hearings conducted intermittently during the trial as the dimensions of the proposals were disclosed. The Arado defendants appealed the denial of their motion and it was the decision on that appeal which we awaited as previously noted.

The new examination for patrol officers was given with our approval, on April 19, without advance disclosure of its contents. The results of the examination have been disclosed to the court and counsel *in camera* and subject to a stringent protective order which the parties have honored. Therefore, we shall not comment here on the results of that examination. So, too, have the results of the medical examinations been disclosed, under similar restrictions. But the results of the third, fourth and fifth phases of the new method—individual interviews, background checks and psychiatric interviews—have not been forthcoming.

The trial on the merits consumed 43 court days. It was concluded by closing arguments on June 26, followed by extensive written briefs.

There followed the affirmance of the temporary sergeants order and the City's renewed request that we vacate or modify the revenue sharing injunction. In respect to the latter, the City was supported by the Chicago Bar Association, the Chicago Crime Commission, the Civic Federation and the Southeast Chicago Commission, as *amici curiae*. While reminding us of their long standing stance

against sexual and racial discrimination, the *amici* acknowledged their lack of familiarity with the record. Nevertheless, they asserted that the economic sanction of revenue sharing termination was inappropriate in the circumstances of the case. We shall treat that argument in the section of this opinion devoted to revenue sharing.

All of which brings us to the merits. As we address them, we observe that because all four of the individual actions were tried as a consolidated case, and because our acceptance of the transfer of the District of Columbia revenue sharing case was conditioned on the parties' agreement that all prior proceedings here could and would be considered as a part of the proceedings in that case, and because each group of intervenors agreed to accept the record in the consolidated case as they found it, and finally, because the preliminary injunction hearing was held under Rule 65(a)(2), *Fed.R. Civ.P.*, all of the evidence adduced by the parties at any stage of the proceedings may be considered in respect to all of the issues presented, subject, of course, to normal standards of relevancy.

## II. SEXUAL AND RACIAL DISCRIMINATION IN THE SELECTION, PROMOTION, ASSIGNMENT AND DISCIPLINE OF POLICE OFFICERS

This part of this memorandum will address the subjects of sexual and racial discrimination in the selection, promotion and assignment of police officers within the Chicago Police Department. We will first consider discrimination against women. We will then turn to racial discrimination in the appointment of patrol officers, the promotion of sergeants and lieutenants and the assignment of officers. Part III of the memorandum will deal with the appropriate remedy, including that applicable to revenue sharing. Because the general claims of racial discrimination in discipline and the private claims of Renault Robinson and the Afro-American Patrolmen's League are so closely intertwined, they will be considered together and separately. A decree pursuant to this memorandum will be entered separately.

### A. *Discrimination against women*

The Civil Rights Act of 1964, as amended by the Equal Employment Opportunity Act of 1972, provides in material part:

The term "person" includes . . . governments, governmental agencies [and] political subdivisions . . . ..

The term "employer" means a person engaged in an industry affecting commerce who has fifteen or more employees . . . ..

The term "industry affecting commerce" means any activity . . . in commerce or in which a labor dispute would hinder or obstruct commerce . . . and . . . includes any governmental . . . activity. . . .

It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire . . . or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex . . . ; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's . . . sex . . . .

42 U.S.C. §§ 2000e(a), (b) and (h) and 2000e–2. There is no question that since March 24, 1972, the effective date of the Equal Employment Opportunity Act of 1972, this statutory prohibition against discrimination in employment on account of sex has been applicable to the Police Department of the City of Chicago.

In our preliminary injunction memorandum we found it undisputed that women had been and were being discriminated against by the City defendants

in entry, employment, assignments and promotions in the Department, in violation of the Act. 385 F.Supp. at 548. We also found that the City defendants had not validated or justified that discriminatory treatment (385 F.Supp. 555) and we enjoined it. 385 F.Supp. 545. If anything, the conduct of the City defendants since then, together with the additional evidence adduced at the trial on the merits, have exacerbated the situation.

It was not until April, 1975—five months after the preliminary injunction issued—that the City defendants undertook any steps to implement their obligations under the decree and the Act. At that time they issued an order allowing incumbent women to apply for reassignment, and permitted women to take the new patrol officers written examination, from which no appointments have been made. Prior to April, they had refused to honor the interim hiring agreement and order, which encompassed women, and since then they have failed to appoint any women from the 1972 matron roster although the use of it was not in any way affected by the preliminary injunction. Even their voluntarily undertaken emergency temporary sergeants program produced no female promotions and had as one of its requirements an almost impossible hurdle for women: three out of the last five years of duty in a field assignment. In short, almost three years after the effective date of the Equal Employment Opportunity Act of 1972, two years after the commencement of the Government's action here and more than one year after the entry of the preliminary injunction, it is still business as usual insofar as women in the Chicago Police Department are concerned.

Furthermore, the additional evidence at trial showed that the entry training which women recruits have received in the past has been at the Training Academy along with and, in all essential respects, the same as that received by patrolmen recruits. On this record there can be no question that the preliminary injunction should be made permanent in respect to the Department's discrimination against women.

An additional issue in respect to women arose during the trial and as a result of the April, 1975 announcement of the new "unisex" patrol officers examination. At that time the City defendants prescribed a minimum height of 5'4" for all applicants. Upon objection by the Government and the Burauer plaintiffs, the test was administered without the imposition of that requirement.

■ An employment requirement based on height appears neutral on its face. However, if the neutral requirement is shown to have a markedly disproportionate impact on a given class of applicants, a *prima facie* case of discrimination is established. *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971).

The evidence shows that while the announced 5'4" height requirement excludes only 7.5 percent of the eligible males, it will exclude 65 percent of eligible females.

In these circumstances, the burden is upon the City defendants to validate the 5'4" requirement by proving that it is job related. Of course, physical strength, of which size is an element, is an important if not essential attribute for those who engage in much of the work which police officers do. But the difference between 5'4" and 5'3", which the evidence shows will markedly reduce the disparity in eligibility, is not so clear. This is particularly so in light of the fact that historically, the Department's minimum height requirement for women has been 5'3". While women have, as we have seen, been discriminated against in their employment opportunities in the Department, the work to which most of them have been assigned—that of matrons and the handling of female prisoners—has required the attribute of physical strength.

■ Because the announced height requirement has not been applied by the City defendants, it will not be specifical-

ly included in the injunction. But it does, in our judgment, fall within the scope of the decree's general prohibition of discrimination against women, absent a persuasive showing of job relatedness which has not been made.

### B. Racial discrimination in the selection, promotion, assignment and discipline of police officers

We turn now to the question of racial discrimination in the selection of patrol officers and the promotion of sergeants and lieutenants by and within the Department. We first observe that no challenge has been made respecting promotions to the rank of captain or the selection of command personnel. Before considering the facts shown by the evidence, attention should be given to the principles of law which have governed our deliberations.

### 1. Governing legal principles

Since our preliminary injunction decision in November, 1974 (385 F.Supp. 543), we have followed closely the decisions of other federal courts in the area of racial discrimination in employment (and particularly public police employment) for the purpose of identifying any which contradict, undercut or weaken the legal conclusions we expressed at that time and our application of them to the facts then before us. We have found none and the parties have called none to our attention. Accordingly, we reaffirm the legal conclusions we there expressed and apply them here with the following additional observations.

The defendants urge that the adoption by the Congress of the Federal Rules of Evidence, and particularly Rule 301 dealing with presumptions, has altered the burden of persuasion in respect to test-job relatedness which we have heretofore imposed on defendants. The issue has arisen as the result of the following passage in our earlier memorandum (385 F.Supp. at 553):

In short, the disproportionate impact raises more than an inference of im-

permissible discrimination which a fact finder is permitted to draw. The conclusion of [impermissible] discrimination is in the nature of a presumption and is required unless the employer persuades the fact finder that the practices used fit the job, predict performance on the job, and are necessary for the on-going effectiveness and efficiency of the employing agency.

Rule 301 of the Federal Rules of Evidence, as enacted by the Congress, provides:

In all civil actions and proceedings not otherwise provided for by Act of Congress or by these rules, a presumption imposes on the party against whom it is directed the burden of going forward with evidence to rebut or meet the presumption, but does not shift to such party the burden of proof in the sense of the risk of nonpersuasion, which remains throughout the trial upon the party on which it was originally cast.

Thus defendants argue that, in our earlier decision, we imposed a burden of persuasion upon them which is now prohibited by Rule 301. It is evident that their argument stems particularly from our statement that "more than an inference" arises from disproportionate impact; "the conclusion of [impermissible] discrimination is in the nature of a presumption and is required unless the employer persuades the fact finder" of job relatedness.

As is frequently the case, a label—"presumption"—for which we readily accept responsibility, has clouded analysis. The beginning point is Section 703(h) of the Civil Rights Act of 1964 which provides in material part:

. . . nor shall it be an unlawful employment practice for an employer to give and to act upon the results of any professionally developed ability test provided that such test, its administration or action upon the results is not designed, intended or used to discriminate because of race, color . . . or national origin. . . .

42 U.S.C. § 2000e–2(h).

In *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), the Supreme Court spoke directly to the subject at hand.

. . . The Act proscribes not only overt discrimination but also practices that are fair in form, but discriminatory in operation. The touchstone is business necessity. If an employment practice which operates to exclude Negroes cannot be shown to be related to job performance, the practice is prohibited.

\* \* \* \* \* \*

On the record before us, neither the high school completion requirement nor the general intelligence test is shown to bear a demonstrable relationship to successful performance of the jobs for which it was used. . . .

\* \* \* \* \* \*

. . . Congress directed the thrust of the Act to the *consequences* of employment practices, not simply the motivation. More than that, Congress has placed on the employer the burden of showing that any given requirement must have a manifest relationship to the employment in question.
401 U.S. at 431, 432, 91 S.Ct. at 853, 28 L.Ed.2d at 164. Emphasis in original.

■ Clearly the Court read the Act as imposing upon the employer the burden of proving that any test which excludes an identifiable racial group is "related to job performance," "bear[s] a demonstrable relationship to successful performance" and has "a manifest relationship to the employment in question."

If any doubt remained it was laid to rest in *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280, 43 U.S.L.W. 4880 (1975). There the Court considered a situation almost identical to that presented in *Griggs* save for the fact that the employer did adduce evidence of job relatedness. The Court said:

In *Griggs v. Duke Power Co.*, 401 U.S. 424 [91 S.Ct. 849, 28 L.Ed.2d 158], this Court unanimously held that Title VII forbids the use of employment tests that are discriminatory in effect unless the employer meets 'the burden of showing that any given requirement [has] . . . a manifest relation to the employment in question.' Id., at 432 [91 S.Ct. at 854, 28 L.Ed.2d at 164].[21] This burden arises, of course, only after the complaining party or class has made out a prima facie case of discrimination—has shown that the tests in question select applicants for hire or promotion in a racial pattern significantly different from that of the pool of applicants.

422 U.S. at 425, 95 S.Ct. at 2375, 45 L.Ed.2d at 301. Footnote 21 to the Court's opinion read, "In *Griggs,* the Court was construing 42 U.S.C. § 2000e–2(h)," which has been previously quoted. The Court then went on to affirm the holding of the Court of Appeals for the Fourth Circuit that Albemarle's evidence of job relatedness was insufficient.

Thus it is clear that it is the Act which imposes the burden of proof of job relatedness of the employer. And this Circuit, as well as others, has held that burden of proof to include "the burden of going forward and the burden of persuasion." *United States v. United Brotherhood, etc.,* 7 Cir., 457 F.2d 210, 214, *cert. denied,* 409 U.S. 851, 93 S.Ct. 63, 34 L.Ed.2d 94 (1972); *Vulcan Society, etc. v. Commission,* 490 F.2d 387, 393 (2d Cir. 1973); *United States v. Hayes International Corp.,* 456 F.2d 112, 120 (5th Cir. 1972). That application of the concept of burden of proof is consistent with the overwhelming weight of authority. *McCormick on Evidence* (Cleary ed. 1972) §§ 336 *et seq.*

■ Finally, assuming *arguendo* the appropriateness of our earlier use of the term "presumption," which we must say we now question,[15] it is clear from the

---

**15.** Test validity is in the nature of a defense to the charge of discrimination rather than a fact which contradicts the *prima facie* showing of discrimination.

express language of Rule 301 that its prohibition regarding "the risk of non-persuasion" has no application here for this is a case which is "otherwise provided for by Act of Congress."

As a consequence of the foregoing, we are confident that the standards we used in evaluating the evidence adduced during the preliminary injunction hearing were correct and we will apply them now to all of the evidence which has been presented on the issues of racial discrimination in employment and promotion in the Department.

### 2. Patrol officers

The issues here remain the same as at the preliminary injunction hearing—the discriminatory effect of the 1971 patrolman examination and the like effect of the results of the Department's background check. The only fresh evidence adduced at the trial on the merits consisted of the testimony of certain men who hold positions on the 1971 patrolman roster, the entry requirements of other law enforcement agencies, including the FBI and the Illinois Bureau of Investigation, and some statistical data regarding the racial breakdown in population and work force. In addition, the defendants urge that we did not give adequate consideration or fair weight to the preliminary injunction testimony of Professor Edwards who, on the eve of that hearing, was hired to validate the 1971 examination. Nor, they urge, did we give proper consideration to the necessity for and methods employed in conducting the background check.

None of our earlier statistical findings regarding the racial impact of the 1971 patrolman examination have been challenged. The Arado defendants, however, apprehensive of the effect on them of a finding of cumulative discriminatory tests, have urged that the starting point of our analysis—the racial mix of the City—was improper; that we should have started with the racial mix of the

Chicago and the greater metropolitan area labor forces.

The evidence shows that in 1960 the male population of Chicago was 76.5% white, 22.5% black and 1% "other," while the male labor force was 81.5% white and only 18.5% black. In 1970 the male population of Chicago was 60.1% white, 32.1% black and 7% Spanish, while the male labor force was 67% white, 25.8% black and 7.2% Spanish. Furthermore, the male labor force for the greater metropolitan Chicago area for 1970 was 86.5% non-black and 13.5% black. These latter statistics are relevant, we are told, because from 1966 until December 4, 1971 (the date the challenged 1971 patrolman examination was given), Chicago police officers were not required to reside in Chicago.

Having established their statistical base, the Arado defendants proceed to argue that "events such as the Martin Luther King riots, the 1968 Democratic Convention confrontations, and the 1969 Black Panther raid, resulted in an antagonism of blacks against the Chicago Police Department and reduced the number of blacks who sought positions in the Department. Closing argument of Arado defendants, p. 13.[16] From this the Arado defendants conclude that "the Government's claim of past discrimination and underrepresentation is unsupported by the evidence in this case." *Id.*

The most striking aspect of the argument is that in 1971, when the male labor force in Chicago was only 25.8% black, and the Department (we assume we are to infer) still suffered from a "reduced . . . number of blacks who sought positions in the Department," blacks comprised 29 + % of the men who wrote the 1971 patrolman examination. Thus, it appears that black male interest in the Department was up rather than down.

Of course, those 1971 black males failed the examination at a rate of 67% while whites failed at a rate of only 33%,

---

**16.** In a different context the Robinson plaintiffs add the "shoot to kill" order allegedly issued during the riots which followed the assassination of Dr. King.

and that factor together with other selection criteria, *i. e.,* place on the roster and background check, resulted in a black male hiring rate of only 10%. The primary inquiry is whether "the tests in question select applicants for hire or promotion in a racial pattern significantly different from that of the pool of applicants." *Albemarle Paper Co. v. Moody, supra.* Accepting the Arado defendants' statistical starting point of black males in the labor market, the result of the 1971 patrolman examination is the same: a grossly disproportionate impact on blacks.

The second aspect of the Arado argument which is intriguing is their adoption of the testimony of plaintiffs' witness Furcon concerning the efforts in the 1960's "of then-Superintendent, O. W. Wilson, to professionalize the Department and to seek selection devices and procedures to attract the most capable people to become Chicago policemen." Closing argument of Arado defendants, p. 12. One of the characteristics of the administration of "this farsighted man" (*Id.*) was a racial mix in the Department of 22%–26% at a time when the black population in the City was approximately 25% and the Chicago black male labor force was between 18.5% and 25.8%.

Those statistics should be compared with the present racial profile of the Department: 83% white, 16% black and 1% Hispanic following a 1970 patrolman examination which black applicants failed at a rate of 77%, Hispanics 70% and whites 42%, and the 1971 examination which, as we have noted, blacks failed at a rate of 67%, Hispanics 68% and whites 33%. And the "far-sightedness" of the 1960's must be compared with the testimony of former Superintendent Conlisk and his successor, incumbent Superintendent Rochford, with respect to the 1972 report of the Law Enforcement Assistance Administration. That report clearly put the City defendants on notice of the adverse effect that the Department's employment practices were having on minority groups. Yet Conlisk disparaged the report as a "numbers game" which was of "no concern"

to him. Rochford, on the other hand, had not bothered to look at the report since becoming Superintendent and had no plans to do so; nevertheless, he disagreed with the report's conclusions.

■ There can be no doubt that the evidence which we have previously summarized at 385 F.Supp. 548–550 showed that the 1971 patrolman examination had a grossly disproportionate impact upon blacks and Hispanics. Accordingly, it was a discriminatory and therefore, unlawful method of selection. Furthermore, from their experience with the 1970 examination, which was in all essential respects the same as that used in 1971, the City defendants knew that the 1971 test was discriminatory.

■ Defendants' argument that other law enforcement agencies, including the FBI and the IBI, use entry tests of like nature need not detain us. In the first place, we note that as time passes those tests are being declared invalid under the Civil Rights Act of 1964 and the equal protection clause of the Fourteenth Amendment. See *Davis v. Washington,* 168 U.S.App.D.C. 42, 512 F.2d 956 (1975), and cases there collected. Furthermore, while the general practice in a trade or industry may be relevant to prove a standard of care, it has never, to our knowledge, been a defense to a charge of discrimination that everyone does it.

Insofar as Professor Edwards' testimony was concerned, we did give it careful consideration in our earlier opinion and we accorded it the weight to which it was entitled. See 385 F.Supp. at 555–556. With all respect to him, it did not show that the 1971 patrolman examination bore "a demonstrable relationship to successful performance of the job for which it was used." *Griggs v. Duke Power Co., supra,* 401 U.S. at 431, 91 S.Ct. at 853, 28 L.Ed.2d at 164.

The defendants have not challenged the preliminary injunction findings with respect to the content, use and disproportionate racial impact of the results of the Department's background investigations of police officer candidates. 385

F.Supp. at 549–550, 556–557. Instead, they urge that the investigative standards of other law enforcement agencies and two recently reported decisions, *Green v. Missouri Pacific R.R. Co.,* 381 F.Supp. 992 (E.D.Mo.1974), and *Lane v. Inman,* 509 F.2d 184 (5th Cir. 1975), establish that we erred in holding that the investigations had not been shown to be job related. *Green* and *Lane* both hold that a prior conviction of a serious offense is, as a matter of law, a valid ground to refuse employment and a license to operate a taxicab, respectively.

■ *Green* and *Lane* need not detain us for we agree that a prior conviction of a serious offense would be a valid ground to disqualify a person from police work. And this would be so regardless of the disproportionate racial impact such a standard might have.

■ Furthermore, we agree that the investigative standards of others do tend to show the need for flexibility in inquiries of this type. But we did not enjoin flexibility in background investigations; we enjoined the standardless application of the unknown in arriving at undefined results in those investigations. All the record shows is that the Department inquires into bad character, immoral conduct and dissolute habits (which the chief administrator of the investigations could not define). In reaching those conclusions inquiry is made with regard to a candidate's education, employment, financial condition, arrests, military service, driving history, and the arrest records of members of his or her family. We have not been given any insight into specific types of negative information that will disqualify a candidate, which may fall into these categories or be learned from these sources. All we know is that across the board, black candidates have been disqualified at a rate 40% greater than white candidates and at a rate of 2 to 1 on the basis of "arrest record" and 3 to 1 on the basis of "negative employment record." When requirements for employment have such a disproportionate impact, they must be defined so that their validity can be determined. The City defendants have declined to provide that definition. Accordingly, the injunction with respect to the use of the results of the background investigations will be made permanent.

What remains is the interest of those men who hold positions on the 1971 patrolman roster—manifested in court by the testimony of a representative sampling of them. They urge that they took and passed the test in good faith and that they should not be penalized by a retrospective determination that the test was discriminatory.

■ The Constitution and the Civil Rights Acts dictate that in cases of this nature, the rights of the victims of discrimination be held paramount. The correlative is that the interests of the unknowing "beneficiary" of the discrimination must be subordinated. This is so because the "beneficiaries" can have no rights which have the unlawful discrimination as their origin.

■ We sit, however, as a court of equity. As such, we can and should undertake to shape a remedy which will disappoint, as little as possible, the aspirations of those who took and passed the 1971 examination in the belief that it was valid. That was a key factor in the decision to approve the interim hiring agreement. That evidently was the intended thrust of the defendants' witness Ornstein. That is what the Isakson defendants request in their final brief. To the extent permissible, we will, in fashioning a decree, seek to respect those aspirations.

For the foregoing reasons and for the reasons stated in the preliminary injunction memorandum, those portions of the preliminary injunction dealing with the appointment of patrol officers from the 1971 patrolman roster, the utilization of the results of the 1971 patrolman examination and the utilization of the results of the Department's current background investigation in the appointment of patrol officers will be made permanent except to the extent otherwise provided in the portion of this memorandum dealing with the appropriate remedy.

### 3. Sergeant promotions

The defendants' most vigorous attack against the preliminary injunction findings and conclusions has been made on the issue of promotions from the 1973 sergeant roster. Here they argue that we misapplied the burden of proof, failed to credit properly the preliminary hearing testimony regarding content and concurrent validity of the 1973 sergeant examination, and did not judge correctly the reliability and job relatedness of the Department's efficiency ratings. In short, we were all wrong.

To bolster their contentions defendants adduced additional expert testimony regarding the validity of the 1973 examination and substantial, impressive testimony from certain men holding positions on the 1973 roster as to their preparation for the examination.

The starting point is the *"consequences* of the employment practices." *Griggs, supra,* 401 U.S. at 432, 91 S.Ct. at 853, 28 L.Ed.2d at 164, emphasis in the original. What were the results of the 1973 sergeant examination? They were uncontroverted and as distressing as the results of the 1971 patrolman examination. In 1973 blacks and Hispanics comprised 17% of the 11,431 patrolmen in the Department. They made up 20% of the pool of 6555 patrolmen who took the sergeant examination, again indicating a higher interest rate than their percentage of the available "labor force" would cause one to predict. But, only 13% of those who passed the test were blacks and Hispanics and only 7.2% of those with a reasonable expectation of promotion were. The practical success rate of whites versus blacks and Hispanics was 7.07% to 2.23% or 3 to 1. 385 F.Supp. 550–553.

■ The defendants argue that this showing of disproportionate impact does not shift the burden to them under *Griggs* and *Albemarle* because this is a promotion test. That fact enters into the ultimate appraisal of the test and may be relevant to the question of the appropriate remedy, but it does not exempt the test from the commands of the equal protection clause or the Civil Rights Act of 1964. And this is particularly true where the pool of applicants was largely made up of persons who were accepted into the Department on the basis of the discriminatory patrolman examinations given in 1970 and 1971 and the showing that the 1968 sergeant examination had been similarly discriminatory in its results. 385 F.Supp. 550.

■ We earlier placed the burden of proof on the City defendants and it remains there. Thus, they were obliged to persuade us of the job related validity of the 1973 sergeant examination.

The burden of persuasion has as one of its benchmarks, the credibility of the witnesses and the weight to be given to their testimony. During the preliminary injunction hearing the defendants placed their stock in this regard in Dr. Charles A. Pounian, a defendant in his capacity as Secretary of the City's Civil Service Commission. Dr. Pounian testified at length on the issues of content and concurrent validity. As to the former, he testified to the enormous energies—four man years—that were devoted to the preparation of the job description which preceded the preparation of the examination. He also testified to his concurrent validity study in which the examination was given to 88 pairs of black-white sergeants with their examination scores being correlated with their efficiency ratings. And while other experts similarly testified in support of the examination, their testimony was based entirely on Pounian's; they were experts approving an expert.

As we wrote in November, 1974, we had misgivings about the substance of the content and concurrent validity studies, and we still do. 385 F.Supp. 557–560. But we also made clear that we had misgivings about the credibility of the testimony given with respect to the studies.

During the preliminary injunction hearing, Dr. Pounian changed his testimony twice while on the stand and his counsel sought to change it a third time by a letter to the court after the hearing

was concluded. 385 F.Supp. 558. The two in-court changes were preceded by knowledgeable cross-examination. Nor were the changes mere "computational errors" by subordinates as defendants have urged. From our comprehension of the theory behind and purpose of the testimony, they so adversely affected the results that "[n]one of the third set of correlations reache[d] a level of practical significance in the judgment of either of defendants' expert witnesses, Dr. Pounian or Dr. Ebel." 385 F.Supp. 559.

Nothing was done during the trial on the merits to bolster Pounian's credibility or that of his studies. But events transpired and evidence was adduced which, while not reflecting directly on Pounian, did reflect on the general credibility of the City defendants' case. We speak of the previously mentioned concealment and destruction of intelligence files relating to Renault Robinson and the officers of the Afro-American Patrolmen's League.

There is no question that the files were concealed in 1971 when the City defendants denied their existence. Only when plaintiffs renewed their discovery requests as the case neared trial on the merits did counsel for the City defendants insist that the files be produced. And then it was disclosed during the trial that certain of the files had been destroyed as late as April, 1974 on the eve of the preliminary injunction hearing.

█ The credibility which a trier of fact extends to a litigant's case is multifaceted. In the final analysis it is a question of confidence in the proof. In the light of this record, we do not have that degree of confidence in the City defendants' evidence respecting the content and concurrent validity studies of the 1973 sergeant examination as to be persuaded by them.

The defendants did, however, undertake to bring greater credibility to the 1973 sergeant examination by calling as an expert witness Dr. Philip Ash of the faculty of the University of Illinois and a person of impeccable credentials. He testified to a number of analyses he made of the examination long after the preliminary injunction hearing. He was permitted to testify out of order so that he could present his views here and meet another professional commitment in Africa.

In his opinion the 1973 written sergeants test is content valid because the Civil Service Commission's job analysis (about which Dr. Pounian testified) was thorough and professional. The specification of tasks into six "exam" categories was correct. The specification of items for coverage was realized by actual items that were included in the test. The match between the content of the job and the content of the test was a close one. The content validity was established in accordance with the EEOC Guidelines and the American Psychology Association Standards.

He validated the examination by his own concurrent validity study. That study yielded correlation coefficients significant at the 1% level; the relationship between performance and test scores was linear and the correlation coefficients had practical significance. In his opinion the 1973 examination provided a practical means of significantly improving the quality of personnel at the sergeant level.

Finally, Dr. Ash performed a differential validity study to test for possible bias of the 1973 sergeant examination against blacks. He found that the 1973 examination produced correlation coefficients significant at the 1% level for blacks and whites separately. He further found that the regression equations for blacks and whites were virtually identical, i. e., that the 1973 examination did not overpredict or underpredict the performance scores for whites or blacks. These findings, in his opinion, established that the examination was not biased against blacks.

On cross-examination it was disclosed that certain of the opinions which Dr. Ash expressed here were at sharp variance with opinions he had recently expressed in other similar cases. For example, he testified that one of the pur-

poses of the examination was to test judgment and, indirectly, psychological characteristics. When he was asked to affirm that a paper and pencil test cannot adequately determine whether a candidate has the necessary judgment and psychological characteristics required of a police officer, he declined to do so. Yet it was disclosed that when he testified for the plaintiffs in *Morrow v. Crisler,* 491 F.2d 1053 (5th Cir. 1974), an action which challenged successfully the entrance examination used by the Mississippi Highway Patrol, he had stated unequivocally that a pencil and paper test could not adequately determine those characteristics.

In respect to his testimony concerning content validity, he agreed that the ultimate purpose of the examination was to select people for job performance as sergeants and that the job was one with diverse duties. He was then asked if, in those circumstances, content validity was not rejected by knowledgeable authorities as a validation technique. He responded in the negative. Then it was disclosed that he had given precisely that opinion in *Morrow v. Crisler, supra,* when he testified in support of the plaintiffs' challenge of the test there.

On direct examination Dr. Ash had stated that there were no feasible alternatives to paper and pencil examination (which the evidence shows tends to have built-in biases against blacks) when large numbers of applicants are to be tested. He repeated that opinion on cross-examination and then was confronted with his contrary testimony for the plaintiffs in *Douglas v. Hampton,* 168 U.S.App.D.C. 62, 512 F.2d 976 (1975).

In this latter regard, it should be noted that while Dr. Ash's testimony was given after the announcement of the 1975 temporary sergeants program, it preceded the results of the program. There, the Department selected qualified persons for the position of sergeant without discriminatory results and without a paper and pencil examination.

██ We hold Dr. Ash in high regard. He is an outstanding figure in his field who has given unstintingly of his time in cases of this nature. But his testimony has not persuaded us that the 1973 sergeant examination is a valid predictor of performance on the job. That, as we understand it, is the test we are to apply in testing the testers. We remain confident of our preliminary findings and conclusions in respect to the 1973 sergeant examination and they are reaffirmed.

The Arado defendants also elicited the testimony of several men, who passed the 1973 examination, that they had studied for it. In the main they studied the general orders of the Department. They also testified that they had failed the 1968 examination when they had not studied. We are told that the testimony was offered to rebut the "bunk" of white "test-wiseness" advanced by the plaintiffs (Arado defendants' closing argument, p. 45) and that it shows that the test was content valid. We are somewhat at a loss as to how evidence of study for an examination rebuts the generally accepted premise that whites tend to do better on written examinations which require reading skills than do blacks. That is what we understand "test-wiseness" to mean. And the Arado defendants' witness, Dr. Ash, did not regard the reading-performance disparity between blacks and whites as "bunk."

The evidence regarding the Department's efficiency ratings and their use in making promotions has always been troublesome. The average difference in ratings between black and white patrol officers for the period January–June 1973 (which was the relevant period for the 1973 sergeant roster) was less than one point: 84.3 to 85.2. Now the evidence also shows that there was no black-white difference in the efficiency ratings for sergeants in the period relevant to the 1970 lieutenant roster.

On the record as now constituted, it is clear that our preliminary injunction was too broad for we enjoined the use of the ratings "as a standard or factor for promotion" without limiting the restraint to sergeant promotions, although that cer-

tainly was our intent. And the parties so regarded it, for the ratings were used in making the lieutenant promotions in March 1975.

██ Upon reflection we have concluded that we erred in respect to the efficiency ratings generally. The one point black and white difference is too slight, although we still observe that in reality it is a one point difference on a scale of 80–95 rather than 0–100. 385 F.Supp. 551. We also remain concerned over the impact of the ratings on the 1973 sergeant roster, *i. e.,* among the top 514 written test scores 62 or 9.3% were blacks while only 31 or 6% of the top 514 roster candidates were black once the efficiency rating factor was applied. *Id.* While there was testimony critical of the method that ratings are assigned and changed (and there is a very serious question with respect to the ratings of Renault Robinson and other members of the Afro-American Patrolmen's League which we do not pass on here), the need for ongoing appraisal of an employee's performance is evident. Individual abuses of the system should not, we are convinced, result in its being declared illegal. This, we note, as the City defendants have, was the conclusion of the LEAA report. Accordingly, the preliminary injunction with respect to the use of efficiency ratings will be vacated and the plaintiffs will be denied relief in this regard.

We are constrained to say that, in our judgment, this conclusion about the use of efficiency ratings for purposes of promotion does not contradict our conclusion with respect to the lack of credibility which we accorded defendants' concurrent validity study of the 1973 sergeant examination. In the first place, the problem of credibility did not arise because the matched pair sergeants' efficiency ratings were used in the study. In the second place, subjective ratings such as these remain a questionable criterion for test validation. 385 F.Supp. 559. The fact that we have now concluded that the subjective ratings have not been shown to be racially discrimina-

tory does not enhance their value for test validation purposes.

For the reasons stated in our earlier memorandum as well as the foregoing, those portions of the preliminary injunction dealing with the appointment of sergeants from the 1973 sergeant roster and the 1973 sergeant examination will be made permanent except to the extent otherwise provided in the portion of this memorandum dealing with the appropriate remedy.

### 4. *Lieutenant promotions*

The questions relating to alleged discrimination in the promotion of lieutenants were not presented at the hearing on the preliminary injunction. The charges are, however, comparable to those made in respect to sergeant promotions: the 1970 written examination and the relevant efficiency ratings.

We need spend no additional time here with respect to the latter for we have just held that they were not discriminatory. For the following reasons, we reach the same conclusion with respect to the examination.

██ The examination was written by 1216 incumbent sergeants: 1090 (89.6%) were white, 119 (9.8%) were black and 7 (.6%) were Hispanic. This compared almost precisely with the 10% of all sergeants who were black or Hispanic. The gross pass rate was 866 (79.4%) white, 87 (73.1%) black and 6 (85.7%) Hispanic. The mix of passes was 90 + % white, 9 + % black and .6% Hispanic. These results do not, in our judgment, show such a disproportionate racial impact as to constitute a *prima facie* case under *Griggs, supra,* and *Albemarle, supra.*

But, plaintiffs urge, the superficial pass-mix rates are misleading. They point to the fact that as of March 10, 1975 only 12 of 276 or 4.3% of the lieutenants were black and only 1 was Hispanic. Following the March 10 promotions 15 or 5.1% were black and still only 1 Hispanic. They go on to point out that of the 85 promotions made from the 1970 list prior to March 10, only 5 or 6%

were black and that of the next 47 men on the list (they representing the present number of vacancies in the rank of lieutenant) only 3 or 6% will be filled by black and Hispanic candidates. Thus they urge that if all of the vacancies are filled from the 1970 list there will be 339 lieutenants of which only 19 or 5.6% will be black and Hispanic.

Of course, the experts were called: Dr. Thelma Hunt for the plaintiffs, Dr. Pounian for the City defendants and Dr. John Wick of Northwestern University, by stipulation, for the McNamara defendants. Dr. Hunt insisted that the 1970 examination had an adverse racial impact; Drs. Pounian and Wick were just as insistent that it did not. Chi Square analyses, which show the probabilities that the pass-fail ratios were the result of chance as opposed to other factors, were computed by Dr. Hunt (1 to 8) and Dr. Pounian (1 to 5). Dr. Wick testified that neither was significant. Dr. Hunt's Chi Square ratio for promotions was 1 to 5; Dr. Pounian's 1 to 2. In Dr. Wick's judgment these computations were conclusive that there was no indication of racial impact.

Of course we are concerned with the low percentage of minorities in the high rank of lieutenant now and in the immediate future. But just as we have applied the burden of proof as we have perceived it to the patrol officer and sergeant situations, so, too, must we apply it here. In our judgment evidence that "the tests . . . select applicants for . . . promotion in a racial pattern significantly different from that of the pool of applicants" has not been shown here. *Albemarle Paper Co. v. Moody, supra.* Certain it is that the evidence is not as compelling as in the cases of the patrol officers and sergeants. We conclude that in the circumstances here presented, the burden of persuasion of discrimination remained with the plaintiffs and they have failed to carry it.

Accordingly, the plaintiffs will be denied any relief in respect to the promotion of lieutenants from the 1970 roster.

### 5. *Assignment of officers*

Beginning with some relatively uncontradicted testimony that through the 1950's the Department assigned virtually all black officers to black neighborhoods, and concluding with a statistical analysis using 1970 census data and current Department assignment data which continue to show racial imbalance in certain areas and units, the plaintiffs urge that racial discrimination in assignments persists.

The City defendants on the other hand, while not conceding the policy of the 1950's, argue that the present pattern of assignments does not warrant a finding of discrimination. Certainly a present explicit policy of racially oriented assignments has not been discovered. And so we are left to inferences. Here, the rationale of *Griggs* and its progeny is not applicable, and none of the parties contends otherwise.

A large part of police work is personal contact work. One of the social ills which comes from minority underrepresentation on this or any other police force is the image of the force, in the eyes of the minorities, as an instrument of the majority. The odds are overwhelming that the officer will be white, regardless of where the police-citizen contact occurs.

We could take judicial notice of the tensions that have existed between white officers and black citizens in predominantly black neighborhoods, but we need not do so for that was the thrust of a good portion of the testimony of the witnesses called by the Robinson plaintiffs. Indeed, one of the avowed purposes of the Afro-American Patrolmen's League is to relieve those tensions through, *inter alia,* the recruitment and employment of more black officers to serve and protect the black citizenry which is so desperately in need of that service and protection.

 This is not to say that the City's Department can segregate its personnel along black neighborhood lines any more than the City's housing authority can foster racially segregated public housing.

It is to say, however, that in our judgment in the volatile area of police-community relations it is not *per se* unlawful for a metropolitan police department, within reasonable limits, to utilize its minority members in those areas where they are most needed. That is the pattern of use which we see from plaintiffs' evidence.

██ As in the case of the efficiency ratings, there was testimony showing abuses of the procedures attending transfers and reassignments. And here, as there, we do not pass now on the special claims of Robinson and the League with respect to assignment and transfer. But the assignment procedures of the entire Department should not be enjoined or subjected to continuing judicial supervision because of those abuses which have not been shown to be widespread and racially motivated.

██ We conclude that while the shortages of blacks in certain areas are acute (the Area V Districts and CID have only 4% and 1.6% blacks respectively, and the Area VI Districts and CID have only 3% and 1% blacks respectively), the districts, units and assignments within the Department do not show such overall disparity as to give rise to a finding of discrimination.

We do observe, however, that when the Department's overall black and Hispanic underrepresentation is overcome, the disparity here complained of should, we believe, solve itself.

For the foregoing reasons plaintiffs will be denied relief in respect to assignments.

### 6. *Discipline*

All of the plaintiffs, save Burauer, have made broad charges of racial discrimination in the Department's discipline system, and the Robinson plaintiffs have additionally complained of 150 separate instances of alleged retaliatory and discriminatory disciplinary proceedings. Having decided to render the foregoing portions of this decision now, we must defer the decision on discipline and the Robinson claims for a short time.

## III. THE APPROPRIATE REMEDIES

Here we are concerned with two distinct subjects: the scope of immediate relief and the articulation of future hiring and promotion standards for the Department, and the consequences of our findings of sexual and racial discrimination on the City's revenue sharing entitlements. We will address them in that order.

### A. *The scope of immediate relief and future hiring and promotion standards*

For the reasons previously stated, the preliminary injunction, which is reported at 385 F.Supp. 545–546, should be made permanent with respect to paragraphs 1 (including subparagraphs (a) through (c)), 2, 3, 4 and 6. Paragraph 5, dealing with efficiency ratings, should be and by this memorandum is dissolved.

The balance of the interim hiring agreement and order of December 16, 1974 must be performed promptly by the City defendants. Throughout this litigation there has been a constant representation to the court of the need for more police officers in the City. If this representation is true, the City defendants have been guilty of gross neglect of their duties. That, of course, is not our immediate concern. But the enforcement of the orders of this court is, even when the order has been entered upon the agreement of the parties. In April, 1975 when we were petitioned by the Camacho plaintiffs to enforce the agreed order in its entirety, we were urged by the City defendants not to do so because the results of the new method of selecting patrol officers were in the offing. It is now nine months later and still we wait. Accordingly, the City defendants will be ordered to proceed with the plan for the employment of police officers embodied in the December 16, 1974 order with the first class of 200 officers to be called for service within 60 days hereof and the balance within 30 days thereafter.

Furthermore, to alleviate any additional shortages of police officers, the City defendants will be authorized to contin-

ue to employ police officers from the 1971 patrolman roster and the 1972 police woman/matron roster, in accord with the ratios adopted in the December 16 order (100 black and Spanish surnamed males from the 1971 patrolman roster, 67 other males from that roster and 33 females from the police woman/matron roster), until the numbers of persons required to comply with these ratios has been exhausted.

Insofar as future hiring is concerned, we have concluded, albeit reluctantly, that some quota standard is needed. As we said in November, 1974, "It is far better in cases of this nature that the remedy come from the parties rather than the court." 385 F.Supp. 561. But we have despaired of such a voluntary remedy. The *in camera* submissions that have been made to us respecting the new methods of selecting patrol officers are so complex that should they fall short we will be back where we started some 18 months ago.

▉ No court, state or federal, should become an employment review board. Our function should be to declare illegal that which we perceive to be illegal, enjoin it if necessary, and then set reasonable standards for those primarily responsible for the operation of the agency involved.

This is particularly true in a case such as this where the racial discrimination has been acute and over such a period of time as to create a large racial imbalance in the Department in relation to the available work force. It is most regrettable that the progress of the '60's was lost in less than 10 years. Hopefully the damage can be mended as quickly.

The problem is different insofar as a future remedy for women is concerned. Here we have virtually no prior experience with which to work. Even the statistics which might be drawn from the new methods of selection are not yet available.

▉ In all of the circumstances we have concluded that a hiring standard of 16% females, 42% black and Spanish sur-name males and 42% other males should be imposed on the Chicago Police Department until further order of the court.

▉ In reaching this conclusion we are not without substantial support. Where an employer has engaged in a pattern or practice of unlawful discrimination, affirmative and mandatory relief is required to ensure full enjoyment of the right to equal employment opportunity. 42 U.S.C. § 2000e–6(a). In such cases, the court has not only the power but the duty both to enjoin future discrimination and as far as possible to require the elimination of the continuing effects of past discrimination. *Rios v. Enterprise Ass'n Steamfitters Local 638,* 501 F.2d 622 (2d Cir. 1974). *United States v. Local 169, Carpenters,* 457 F.2d 210, 216 (7th Cir. 1972), *cert. denied,* 409 U.S. 851, 93 S.Ct. 63, 34 L.Ed.2d 94 (1972); *United States v. Ironworkers Local 86,* 443 F.2d 544 (9th Cir. 1971), *cert. denied,* 404 U.S. 984, 92 S.Ct. 447, 30 L.Ed.2d 367 (1971); *Morrow v. Crisler,* 491 F.2d 1053 (5th Cir. 1974) *(en banc); United States v. IBEW Local 212,* 472 F.2d 634 (6th Cir. 1973); *Carter v. Gallagher,* 452 F.2d 315 (8th Cir. 1971) *(en banc), cert. denied,* 406 U.S. 950, 92 S.Ct. 2045, 32 L.Ed.2d 338 (1972); *United States v. Local 46, Lathers,* 471 F.2d 408 (2d Cir. 1973). The necessity for affirmative relief is not eliminated by the fact that an employer has taken some initial steps toward the elimination of discrimination. *United States v. Local 520 Operating Engineers,* 476 F.2d 1201 (7th Cir. 1973); *United States v. IBEW Local 38,* 428 F.2d 144 (6th Cir. 1970), *cert. denied,* 400 U.S. 943, 91 S.Ct. 245, 27 L.Ed.2d 248 (1970).

▉ Relief imposing numerical goals and ordering accelerated hiring of minority persons from among qualified applicants is both constitutional and appropriate to make up for the effects of an employer's discriminatory practices, especially where such relief is necessary to the achievement of prompt and substantial change in the racial and ethnic makeup of the employer's work force.

*NAACP v. Allen,* 493 F.2d 614 (5th Cir. 1974); *Morrow v. Crisler,* 491 F.2d 1053 (5th Cir. 1974) *(en banc); Carter v. Gallagher,* 452 F.2d 315 (8th Cir. 1971) *(en banc), cert. denied,* 406 U.S. 950, 92 S.Ct. 2045, 32 L.Ed.2d 338 (1972); *United States v. Ironworkers Local 86,* 443 F.2d 544 (9th Cir. 1971), *cert. denied,* 404 U.S. 984, 92 S.Ct. 447, 30 L.Ed.2d 367 (1971); *United States v. IBEW Local 212,* 472 F.2d 634 (6th Cir. 1973); *Boston Chapter, NAACP and United States v. City of Boston,* 371 F.Supp. 507 (D.Mass.1974); *see also Southern Illinois Builders Ass'n v. Ogilvie,* 471 F.2d 680 (7th Cir. 1972); *Pennsylvania v. Sec'y of Labor,* 442 F.2d 159 (3d Cir. 1971), *cert. denied,* 404 U.S. 854, 92 S.Ct. 98, 30 L.Ed.2d 95 (1971).

We have reached a like conclusion with respect to the promotion of sergeants. Here there is no new method of selection in the offing. But the Department will need middle level supervisors, although some of those needs have undoubtedly been met by the temporary sergeants program.

■■■ The goal is a sergeant mix reasonably representative of the patrol force, the minority and female percentages of which will begin to increase under the provisions of the decree relating to patrol officers. We start, of course, with virtually no available women. In these circumstances a promotion standard of 40% black and Spanish surname males and 60% other males is reasonable. These candidates may be selected from the 1973 sergeant roster, as the Arado defendants urge, until new selection methods are developed.

■■■ The Government seeks back pay under 42 U.S.C. § 2000e–5(g) for those who have been injured by the City defendants' discriminatory hiring and promotion practices. As we read *Albemarle Paper Co. v. Moody, supra,* such an award is to be made unless there are reasons for denying it "which, if applied generally, would not frustrate the central statutory purposes of eradicating discrimination throughout the economy and making persons whole for injuries

suffered through past discrimination." 422 U.S. at 421, 95 S.Ct. at 2373, 45 L.Ed.2d at 299. The City defendants have not asserted the existence of such reasons. Indeed, in their post trial brief, which was filed subsequent to the decision in *Albemarle,* they advanced no reasons in opposition to a back pay award. Accordingly, the decree should provide for such an award to be sought by the Government.

The Burauer plaintiffs earlier requested that they be certified as the representatives of a class of women who have been denied employment by the Chicago Police Department. We denied that request upon the ground that the Government will adequately represent those injured by the City defendants' misconduct.

The Camacho plaintiffs have a similar motion pending which, we confess, we overlooked in the paper chase this case has been. For that we ask counsel's indulgence.

■■■ For similar reasons the Camacho motion to certify a class should be denied. In view of the Government's willingness to prosecute the claims of all injured persons, it cannot be said that either a Burauer or Camacho class would be "superior to other available methods for the fair and efficient adjudication of the controversy." Rule 23(b)(3), *Fed.R.Civ.P.*

It is clear, however, that the Burauer and Camacho plaintiffs may personally press their individual claims, or they may assert them through the Government. It is also clear that their counsel are entitled to attorneys fees under 42 U.S.C. § 2000e–5(k). Fees for counsel for the Robinson plaintiffs, on the other hand, should await the decision of the Robinson claims.

### B. *Revenue Sharing*

In brief compass the recent record of the Police Department of the City of Chicago in the area of sexual and racial discrimination in employment and promotion is this.

In the mid 1960's the overall racial profile of the Department reflected the City which it served, at least insofar as total employment was concerned. Beginning in the late '60's that profile became severely distorted to the end that today the Department, which serves a community that is 40% black and Hispanic, is only 17% black and Hispanic. The City has offered no explanation for this radical change. The Arado defendants have suggested that the black discontent and riots of the late '60's so disenchanted black males as to cause them to reject police work as a vocation. But as we have seen, that argument just does not withstand analysis. Indeed, were we to regard the riots of the late '60's as a relevant circumstance we would be inclined to conclude that they triggered an anti-black animus which contributed to the low recruitment of black patrol officers. That, as we understand it, is the position of the Robinson plaintiffs whose particularized claims we will decide shortly. Now we only observe that there is evidence which supports that thesis; there is also evidence which contradicts it.

It is undisputed, however, that in 1968 the Department gave a sergeant promotion examination the results of which were clearly discriminatory; in 1970 it gave a patrolman examination with the same results; in 1971 another discriminatory patrolman examination and in 1973 another discriminatory sergeant examination. It is also undisputed that in 1972 the Law Enforcement Assistance Administration of the Department of Justice reported the results of a study to the command of the Police Department. That study showed severe racial imbalance in the Department. The Superintendent of the Department at the time of the report regarded it as a "numbers game" which was of "no concern" to him. His successor, as of the taking of his deposition in this action, had not read the report since assuming his command but he knew he disagreed with its conclusions.

Throughout this period the equal protection clause of the Fourteenth Amendment and 42 U.S.C. § 1981 were applicable to the City's Police Department and on March 24, 1972 the Equal Employment Opportunity Act of 1972 made Title VII of the Civil Rights Act of 1964 applicable to it. Whether the equal protection clause prohibited discrimination in a police department on the basis of sex is a question we need not decide. It is clear that the Civil Rights Act of 1964 does and that during the 30 months which intervened between the March 1972 effective date of the Act and the entry of the preliminary injunction here, the City defendants did virtually nothing to end the discrimination against women in the Police Department. Furthermore, the record here, as previously recited, shows that the Department has done virtually nothing in that regard since the preliminary injunction.

On October 20, 1972 the Fiscal Assistance to State and Local Government Act became effective. 31 U.S.C. § 1221 *et seq.* Its philosophy is to return to state and local governments a portion of the individual federal income taxes paid by the inhabitants of the territory governed by the state and local government. Included in the permitted uses to which such funds may be put is "public safety (including law enforcement . . . )." 31 U.S.C. § 1222(a)(1)(A). The federal appropriations expire at the end of the period beginning July 1, 1976 and ending December 31, 1976.

The funds are payable to the state and local governments almost as a matter of right on a quarterly basis. All that is required of the governmental recipient of the funds is a brief statement showing that the funds will be used in accord with the very broad guidelines of 31 U.S.C. § 1222, which, as we have seen, include public safety and law enforcement.

Section 122(a) of the Act provides, however, that

No person . . . shall on the ground of race, color, national origin, or sex be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity funded in whole or

in part with funds made available under subchapter I of this chapter.

31 U.S.C. § 1242(a).

During the years 1972, 1973 and 1974, the City of Chicago received more than $135,000,000 which were used to finance its Police Department. Already under the obligations of the Constitution and applicable Civil Rights Act, the City accepted the funds under the obligations of the Fiscal Assistance to State and Local Governments Act.

■ On December 18, 1974 the District Court for the District of Columbia enjoined the ORS defendants from making further revenue sharing payments to the City until, *inter alia,* the City was subject to a final order here, had agreed to comply with the order and had in fact complied with the order. Upon transfer of the District of Columbia case here, we adopted that injunction and refused to modify or vacate it. 395 F.Supp. 329. Our reasons for that decision have been fully recited and need not be repeated here. On November 13, 1975 we again refused to modify the injunction. We now conclude that it should be made permanent to the end that the ORS defendants are enjoined from making revenue sharing payments to the City until the City has complied with the decree entered pursuant to this decision.

The legal bases for this conclusion have been previously stated. 395 F.Supp. 329. They are presently before the Court of Appeals and we shall not elaborate upon them at this time.

What remains here is the exercise of our discretion to make the order permanent, in the full realization that $76,000,000 (and by this date perhaps $95,000,000) have been impounded. We have done so for the following reasons.

The evidence shows that the City defendants have knowingly engaged in racial and sexual discrimination in employment and promotion within the Chicago Police Department. Accordingly, they have knowingly violated the equal protection clause of the Fourteenth Amendment, applicable Civil Rights Acts and the Fiscal Assistance to State and Local Governments Act.

The evidence shows that throughout the relevant time period, i. e., since October 20, 1972, the City defendants have done virtually nothing to alleviate the effects of their discrimination.

The City defendants take the position that they are entitled to the revenue sharing funds as a matter of right, overlooking the plain mandate of the Act and the fact that the moneys which flow under the Act have as their origin the federal personal income tax payments from the inhabitants of the City, 40% of whom are black and Hispanic and 50% of whom are women, the victims of their discriminatory conduct.

The funds will not be lost. They have been impounded and are available to the City whenever it brings itself into compliance with the requirements of law. What is obvious, however, is that the City demands the funds before it complies with the law.

That is also what the *amici curiae* urged when they, uninformed as to the record, appeared here in support of the City's motion to modify: a pay now, performance later philosophy. We cannot accept that. We are firm in our conclusion that the most effective remedy to end the sexual and racial discrimination we have found to exist with the Chicago Police Department is the economic sanction which we have chosen.

■ There is, of course, the question of whether the ORS defendants need be enjoined. Their counsel, the Department of Justice, suggests that such judicial restraint on the executive branch of government is uncalled for. We rejected those same arguments in April 1975 and we reject them again. The ORS defendants' actions have been ambiguous and faltering. It is quite unclear to us what their position is in the matter. We know they have withheld payments to the City in compliance with the orders of the District of Columbia court and this court. But it is not clear that they would continue to withhold those payments should the injunction be dissolved.

This is particularly so in light of the ambiguous stance the Department of Justice has taken in this litigation. When the Government's complaint was amended in May, 1974 to claim under 31 U.S.C. § 1242(a) and (c), we understood one of the issues in the case would be the repayment (we have called it "recapture") of funds previously used unlawfully by the City's Police Department. The Secretary has adopted a regulation authorizing referral of claims for repayment to the Attorney General "for an appropriate civil action to require repayment" if relief for prior violations cannot be obtained by downward adjustment in future payments. 31 C.F.R. § 51.-32(f)(v). And Section 122(c) itself authorizes an action by the Attorney General "for such relief as may be appropriate." 31 U.S.C. § 1242(c).

But the Government has not sought repayment. Neither its pretrial briefs, post trial brief nor proposed decree make any reference to the subject. Of course we recognize that the Secretary and the Attorney General are vested with great discretion in such matters. So much so that we deny the Robinson plaintiffs' prayer in 75 C 79 for an injunction which would compel the ORS defendants to seek repayment. But we are at a loss as to the future plans of the Government in this regard. Does it intend to make downward adjustments in future payments? Does it intend to withhold entirely future payments? Does it intend to forego entirely any claim for repayment?

The past is history and we leave to those responsible for the administration of the revenue sharing program the decision as to what should be done respecting past payments. But payment of the moneys presently impounded will continue to be restrained and future payments of revenue sharing moneys to the City of Chicago will be enjoined until further order of court.

The parties are directed to prepare a decree in accord with the foregoing and present it by January 14, 1976.

## SUPPLEMENTAL MEMORANDUM

When, on January 14, the several parties presented their suggestions in respect to the decree to be entered herein, the City defendants questioned our jurisdiction to proceed in light of the interlocutory appeal pending in the Court of Appeals for this Circuit. We requested authorities from the parties which have been presented and given our close attention. In addition, we deferred entry of the decree for a reasonable period of time to afford the defendants the opportunity to seek prohibitory relief against us in the Court of Appeals should they wish to do so. No action has been taken by the City defendants in the latter regard and our reexamination of the authorities which speak to jurisdiction persuades us that we were correct in our conclusion stated in our memorandum decision of January 5, that jurisdiction is here to proceed on the merits despite the pendency of the interlocutory appeal.

Pursuant to 28 U.S.C. § 1292(a)(1) (1970), the courts of appeals have jurisdiction of appeals from interlocutory orders of the district courts granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions. Unlike Section 1292(b) which authorizes interlocutory review of certified questions, Section 1292(a)(1) does not affirmatively state that the proceedings in the district court are stayed pending appeal. Rule 62(a), Fed.R.Civ.P., does provide that "unless otherwise ordered by the court, an interlocutory or final judgment in an action for an injunction . . . shall not be stayed during the period after its entry and until an appeal is taken or during the pendency of an appeal." Furthermore, pursuant to the provisions of Rule 62(g) and Fed.R.App.P. 8(a) a party may seek a stay of proceedings in the district court pending an appeal. No stay was, to our knowledge, sought here.

The decisions universally hold that absent a stay order, an appeal from an interlocutory order pursuant to Section 1292(a)(1) does not divest the dis-

trict court of jurisdiction to proceed with the merits of the cause.

The seminal case is *Ex parte National Enameling & Stamping Co.,* 201 U.S. 156, 26 S.Ct. 404, 50 L.Ed. 707 (1906), involving a forerunner of Section 1292(a). (Act of March 3, 1891, § 7, 26 Stat. 828, *as amended,* 28 Stat. 661, 31 Stat. 660.) The Court held that while the statute allowed an appeal from an interlocutory order or decree granting or continuing an injunction, other proceedings in the district court were not stayed. "It was not intended that the cause as a whole be transferred to the appellate court prior to the final decree. The case, except for the hearing on the appeal from the interlocutory order, is to proceed in the lower court as though no such appeal had been taken, unless otherwise specifically ordered." 201 U.S. at 161–62, 26 S.Ct. at 406, 50 L.Ed. at 708.

More recently, a number of courts of appeals have held, "an appeal from an order granting or denying a preliminary injunction does not divest the district court of jurisdiction to proceed with the action on the merits." 9 J. Moore, *Federal Practice* ¶ 203.11, at 739 (2d ed. 1975). Thus in *Janousek v. Doyle,* 313 F.2d 916, 920–22 (8th Cir. 1963), the court held that an appeal from a denial of a preliminary injunction did not divest the district court of jurisdiction to dismiss the case when the plaintiff failed to appear for trial. Moreover, the court held that if the district court's order of dismissal was correct, the appeal from the denial of the preliminary injunction would be moot. Similar conclusions have been reached by other courts. *See, e. g., DePinto v. Provident Security Life Ins. Co.,* 374 F.2d 50 (9th Cir. 1967); *Nalco Chemical Co. v. Hall,* 347 F.2d 90 (5th Cir. 1965); *United States v. Lynd,* 321 F.2d 26 (5th Cir. 1963), *cert. denied,* 375 U.S. 968, 84 S.Ct. 486, 11 L.Ed.2d 416 (1963); *S.E.C. v. Okion,* 137 F.2d 862 (2d Cir. 1943).

In conclusion, the City defendants' appeal of the order denying their request to modify the preliminary injunction impounding revenue sharing funds did not divest us of jurisdiction to proceed with a decision on the merits, absent a stay order issued by the Court of Appeals.

Nor do *Chicago Housing Tenants Organization, Inc. v. CHA,* 512 F.2d 19 (7th Cir. 1975); *Grand Opera Co. v. 20th Century-Fox Film Corp.,* 235 F.2d 303 (7th Cir. 1956), and *Lloyd v. Lawrence,* 60 F.R.D. 116 (S.D.Tex.1973), relied upon by the City defendants, suggest let alone require a different result. *Grand Opera* and *Lloyd* both involved questions concerning the jurisdiction of the district court while an appeal was pending from a final judgment on the merits. *Chicago Housing Tenants Organization,* on the other hand, strongly suggests the very conclusion we have reached here. 512 F.2d at 22.

Accordingly, a final decree has been entered this date in accord with the Memorandum Decision of January 5, 1976.

## FINAL DECREE GRANTING PERMANENT INJUNCTION AND OTHER RELIEF PURSUANT TO RULES 52(a), 54(b) and 65(d) FED.R.CIV.P.

These consolidated cases have been tried on the merits pursuant to Rule 65(a)(2), *Fed.R.Civ.P.* The Court has considered all of the evidence presented by all of the parties at all of the evidentiary hearings held herein and has considered all of the oral and written arguments advanced by counsel for all of the parties. The Court finds and concludes that it has jurisdiction of the parties hereto and the subject matter hereof and that it has been fully advised in the premises. The Court has heretofore rendered its Memorandum Decision of January 5, 1976 and its earlier Memorandum Decisions of April 24, 1974, November 7, 1974 and April 21, 1975, all of which are incorporated herein, as its findings of fact, conclusions of law and the reasons for granting the injunction described herein, pursuant to Rules 52(a) and 65(d), *Fed.R.Civ.P.* Although this decree disposes of fewer than all of the claims of the parties, the Court finds that there is

no just reason to delay the entry of this decree, its enforcement or any appeal taken herefrom and, accordingly, pursuant to Rule 54(b), *Fed.R.Civ.P.,* expressly directs the Clerk of this Court to enter this decree as a final judgment in respect to the claims of the parties adjudicated herein.

NOW THEREUPON IT IS ORDERED, ADJUDGED AND DECREED:

## I.

*Selection, Appointment, Assignment and Promotion of Police Officers for and within the Chicago Police Department*

1. The defendants City of Chicago, James M. Rochford, Superintendent, Chicago Police Department, William E. Cahill, Reginald Dubois, Quentin J. Goodwin, Commissioners, Chicago Civil Service Commission, Charles A. Pounian, Secretary, Chicago Civil Service Commission, James B. Conlisk, Marlin W. Johnson, Wilbur Daniel, Paul W. Goodrich, Lewis F. Peick and Sebastian Rivera, Chicago Police Board, (hereafter sometimes referred to as "Chicago defendants") and their officers, agents, servants, employees and all persons and organizations in active concert or participation with them are permanently enjoined from engaging in any act or practice which has the purpose or effect of discriminating against any employee of, or any applicant or potential applicant for employment with the Chicago Police Department because of such individual's sex, race, color, or national origin, and specifically from:

(a) Failing or refusing to recruit, hire and promote for and within the Chicago Police Department black and Spanish-surnamed persons on an equal basis with white persons of non-Spanish origin;

(b) Failing or refusing to recruit, hire, assign and promote for and within the Chicago Police Department women on an equal basis with men;

(c) Using any qualifications, tests, standards or procedures for purpose of recruiting, hiring, assigning or promoting persons for or within the Chicago Police Department which are not validated as job-related and which exclude blacks, Spanish-surnamed persons or women from employment opportunities in the Chicago Police Department in ratious disproportionate with the exclusion of white males of non-Spanish origin.

2. The Chicago defendants shall make no further certifications for appointment to the rank of Patrolman in the Chicago Police Department from the eligibility list based on the 1971 Patrolman's Examination, except as provided herein in paragraphs 6 and 7 and they shall not administer or utilize police entrance examinations of the type administered in 1971 as the Patrolman's Examination.

3. The Chicago defendants shall make no further use of a background investigation or the results thereof as a standard of appointment to the rank of Patrolman in the Chicago Police Department unless objective criteria are established for such background investigation and they are validated as job-related or shown to have no adverse racial impact; provided, however, that nothing herein shall prohibit the Chicago defendants from disqualifying a person from appointment to the Chicago Police Department because of such person's prior conviction of a serious criminal offense.

4. The Chicago defendants shall make no further certifications for promotion to the rank of sergeant in the Chicago Police Department from the current eligibility list based on the 1973 Sergeant's Examination, except as provided herein in paragraph 9 and they shall not hereafter administer or utilize sergeant promotion examinations of the type administered in 1973.

5. The Chicago defendants shall discontinue the classification Patrolman in the Chicago Police Department and the classification Patrol Officer (or some similar term) shall be substituted therefor, and women shall be recruited, hired, assigned and promoted to positions in the Chicago Police Department in accordance with the same standards and

procedures and on an equal basis with men. The Chicago defendants shall, within 30 days of the entry of this decree, offer to incumbent police women and police matrons an opportunity to transfer to other police officer work for which they are qualified (such qualifications to be determined in accord with the provisions of this decree) and they shall be so transferred as soon as such work is available.

6. The balance of the Interim Hiring Agreement and Order approved and entered by this Court on December 16, 1974 shall be performed by the Chicago defendants. Approximately 400 applicants shall be certified by said defendants to the Chicago Police Department Training Academy in two groups of 200 each for inclusion in training classes to commence on or about March 5, 1976 and April 5, 1976. For each training class of approximately 200, the ratio of black and Spanish-surnamed males, females and other males will be as follows:

(a) 100 positions will be filled by black and Spanish-surnamed males from the eligibility list based on the 1971 Patrolman's Examination;

(b) 33 positions will be filled by females from the eligibility list based on the 1972 Policewoman/Matron's Examination;

(c) 67 positions will be filled by other males from the eligibility list based on the 1971 Patrolman's Examination. Selection and certification of police officers pursuant to this paragraph and paragraph 7 hereof shall, in all respects, be in accordance with the procedures of this order and the December 16, 1974 Interim Hiring Order and appendices thereto, and said order and its appendices are incorporated herein by reference.

7. To alleviate any additional shortages of police officers, the Chicago defendants are authorized, upon compliance with paragraph 6 above, to continue to employ police officers in rank order from among those remaining on the eligibility lists based on the 1971 Patrolman's Examination and the 1972 Policewoman/Matron's Examination, in accordance with the ratios adopted in the Interim Hiring Order of December 16, 1974 and set forth in paragraph 6 above, until the number of persons in any of the three classes (black and Spanish-surnamed males, other males, or females) available to comply with those ratios has been exhausted.

8. In order to remedy the present effects of the Chicago defendants' past discriminatory hiring and promotion practices and procedures, the following affirmative steps are ordered:

(a) Defendants shall as a long term goal seek to recruit and appoint as police officers in the Chicago Police Department qualified black, Spanish-surnamed persons and females in sufficient numbers so as to increase substantially the minority composition of the Chicago Police Department so that it more nearly reflects the racial and ethnic composition of the work force of the City of Chicago as a whole, and to recruit and hire women in sufficient numbers so as to provide equal employment opportunities for women in the Chicago Police Department.

(b) To insure as quickly as practicable the attainment of the above long-term goal, after present vacancies are filled in accordance with paragraphs 6 and 7 above, the Chicago defendants shall, subject to the availability of qualified black, Spanish-surnamed and female applicants, appoint at least 16 per cent females and 42 per cent black and Spanish-surnamed males to all future police officer vacancies in the Chicago Police Department, until further order of the Court. So long as they comply with this requirement of this decree, the Chicago defendants are authorized to appoint, at their election, but in rank order, persons who remain on the eligibility lists based upon the 1971 Patrolman's Examination and the 1972 Policewoman/Matron's Examination after compliance with paragraphs 6 and 7 above.

(c) The Chicago defendants shall consider for appointment as police officers in the Chicago Police Department all persons who meet the existing age and residency requirements, the physical

standards and medical examination requirements set forth in the Partial Consent Decree entered on June 28, 1974 in *Camacho v. City of Chicago, et al.,* No. 73 C 1252.

(d) All persons who passed the 1971 Patrolman's Examination, who were disqualified as a result of the Civil Service Commission medical and physical examination and who have not been re-examined in accordance with the procedures set forth in the Partial Consent Decree in *Camacho v. City of Chicago,* shall be promptly notified by the Chicago defendants at their last known address by certified mail, return receipt requested, or by such other reasonable means as are likely to result in actual notice to them of the opportunity to be re-examined in accordance with the procedures set forth in the Partial Consent Decree entered on June 28, 1974 in *Camacho v. City of Chicago.* The Chicago defendants shall submit to the Court and to counsel for plaintiffs, no later than June 1, 1976, a report identifying all persons who were so re-examined, identifying those who passed and those who failed. Upon appropriate motion, the Court will rule upon the rights of those who are successful.

(e) All persons who passed the 1971 Patrolman's Examination, who were disqualified as a result of the subsequent background investigation shall be promptly notified by the Chicago defendants at their last known address, return receipt requested, or by such other means as are likely to result in actual notice to them of the opportunity to undergo any new background investigation developed by the Chicago defendants in accord with the provisions of paragraph 3 above. The Chicago defendants shall submit to the Court and to counsel for plaintiffs, no later than 60 days after the development of new background investigation standards and procedures, a report identifying all such persons who qualify under such new background investigation standards and procedures. Upon appropriate motion, the Court will rule upon the rights of such persons.

(f) The Chicago defendants shall comply in all respects with those provisions of Parts II and IV of the Order Regarding Selection Procedures, entered April 17, 1975, which are concerned with the selection of patrol officers for the Chicago Police Department.

9. In order to remedy the present effects of the Chicago defendants' past discriminatory practices and procedures for promotion to sergeant, the following affirmative steps are ordered:

(a) The Chicago defendants shall adopt and seek to achieve a goal of promoting blacks, Spanish-surnamed persons and females to the rank of sergeant so as to have and maintain a sergeant mix reasonably representative of the patrol force, the minority and female percentages of which will begin to increase under the provisions of this decree relating to the appointment of patrol officers.

(b) To ensure as quickly as practicable the attainment of this goal, 40% of the promotions to the rank of sergeant shall consist of black and Spanish-surnamed persons, subject to the availability of qualified applicants, until further order of the Court. The Chicago defendants are authorized to utilize, in rank order, the eligibility list based on the results of the 1973 Sergeant's Examination for the selection of such persons until other selection methods are developed or until the number of black and Spanish-surnamed persons on that eligibility list has been exhausted. In complying with this requirement of this decree, the Chicago defendants are authorized to make permanent the temporary promotions to the rank of sergeant which were made pursuant to Part III of the Court's Order Regarding Selection Procedures entered April 17, 1975, or to remove those persons so temporarily appointed and to fill the vacancies so created in the rank of sergeant from the eligibility list based on the results of the 1973 Sergeant's Examination in accord with the terms of this paragraph; provided, however, that if said temporary promotions are made permanent, the next succeeding group of persons promoted to the rank of ser-

geant shall consist of a sufficient number of black and Spanish-surnamed persons as to make that group together with the group of temporary sergeants made permanent, 40% black and Spanish surnamed.

(c) An appropriate goal for promotion of females to the rank of sergeant will be considered, upon appropriate motion when a sufficient number of females are available in the patrol officer rank.

10. The Chicago defendants are authorized to promote to the rank of lieutenant those persons on the eligibility list based upon the 1970 Lieutenant's Examination.

11. Until further order of this Court, the Chicago defendants shall file with the Court and serve copies on counsel for plaintiffs, the following:

(a) On or prior to the last day of any month in which the Chicago defendants certify for training or offer positions as patrol officers to any persons pursuant to the provisions of paragraphs 7 and 8 above, or promote any persons to the position of sergeant pursuant to the provisions of paragraph 9 above, a list of the persons so certified, appointed, or promoted which shall show the name, current address, race, sex and position on any eligibility list of all such persons.

(b) On or prior to the last day of any month in which any new group of persons certified for training classes as patrol officers complete such training class, the Chicago defendants shall file with the Court, and serve on counsel for the plaintiffs, a report indicating whether each trainee, by name, was successful or unsuccessful in completing the training course and an explanation shall accompany such report setting forth the reasons for the discharge of any trainee.

(c) Upon acceptance of those persons who successfully complete the training period as probationary patrol officers, the Chicago defendants shall report, in the quarterly report required pursuant to the provisions of paragraph 11–(d) below, indicating the total number of probationary patrol officers who complete the probationary period, and for each probationary patrol officer who is dismissed or no longer a probationary officer, the reasons therefor.

(d) Within 30 days of the date of entry of this decree, and thereafter within 30 days of the last day of the months of June, September December and March, a report or computer printout (with appropriate code descriptions) identifying all sworn members of the Chicago Police Department by name, rank, race, sex and social security number for each unit of the Department, and (except for the first report) identifying all such persons who were either appointed or promoted during the quarterly reporting period together with their appointment or promotion date, and identifying those who during the quarterly reporting period left the employment of the Department and the reasons therefor.

12. In accord with the purposes of Title VII of the Civil Rights Act of 1964, as amended, to make whole by an award of back pay to all identified victims of the Chicago defendants' unlawful discriminatory employment practices and, to the extent appropriate, to order retroactive seniority adjustments for all identified victims of the Chicago defendants' unlawful discriminatory promotion practices, the plaintiff United States of America is directed to proceed to undertake such discovery as is necessary to seek such awards and adjustments and to report to the Court on the progress thereof within 60 days of the entry of this decree. Absent an agreement among the parties as to the amount of awards and adjustments to be made to identified members of the affected classes, ancillary proceedings will be instituted in respect thereto. The individual plaintiffs in the action brought by Tadeo Robert Camacho, 73 C 1252, and the individual female plaintiffs who intervened with Carolyn Burauer may, if they elect, present individual petitions for awards of back pay.

13. The motion of Tadeo Robert Camacho, et al., plaintiffs in No. 73 C 1252, for certification of a class pursuant to Rule 23(b)(3) of the Federal Rules of

Civil Procedure, filed March 27, 1974, is hereby denied, without prejudice to the rights of the members of that alleged class to participate in the back pay and seniority awards and adjustments contemplated by paragraph 12 hereof.

14. Attorneys for Carolyn Burauer, et al. and Tadeo Robert Camacho, et al. may present appropriate petitions for reimbursement of expenses and attorneys fees to be awarded to them for services rendered to date. Such petitions shall be filed within 30 days and shall specify the parties against whom the petitioners believe such costs and fees should be assessed and any defendant or intervening defendant who desires to do so may answer such petitions within 30 days thereafter. Petitions for attorneys fees for future services will be entertained as appropriate.

## II.

### Revenue Sharing

15. The defendants in No. 75 C 79, William E. Simon, Secretary of the Treasury, Graham W. Watt, Director of the Office of Revenue Sharing, William H. Sager, Chief Counsel, Office of Revenue Sharing, and Robert T. Murphy, Compliance Manager, Office of Revenue Sharing (hereafter "ORS defendants") and their officers, agents, servants, employees and all persons and organizations in active concert or participation with them are enjoined from making any further payments of federal revenue sharing funds to the City of Chicago pursuant to the State and Local Fiscal Assistance Act of 1972, 31 U.S.C.A. § 1221, *et seq.,* until further order of this Court.

16. The ORS defendants shall monitor the activities of the Chicago defendants to determine their compliance with this order and with the non-discrimination requirements of the State and Local Fiscal Assistance Act of 1972 and, commencing March 31, 1976, shall file with this Court and serve upon all counsel of record, quarterly reports analyzing the progress toward compliance made by the Chicago defendants and any indication or evidence found of non-compliance with the requirements of the Act or of this decree.

17. Within 30 days of the entry of this decree, all of the parties shall submit to the Court a proposed plan and timetable for the release of all or portions of the Revenue Sharing entitlements due to the City of Chicago. The plan shall propose a timetable for and the extent to which the Chicago defendants must comply with the requirements of this decree in order to obtain a release of some or all of the Revenue Sharing entitlements due to the City of Chicago. The plan shall also include a specific statement by the ORS defendants as to their intent respecting past Revenue Sharing payments made to the City of Chicago.

18. The plaintiffs' request in No. 75 C 79 for an injunction compelling the ORS defendants to seek repayment of funds previously paid to the City of Chicago pursuant to the State and Local Fiscal Assistance Act of 1972 is hereby denied.

## III.

### Miscellaneous

19. The Court retains jurisdiction of this cause to enforce this order, for determination of any related matter, for the entry of other orders as provided in this decree, and for any other appropriate purposes including the adjudication of those issues reserved in the Court's Memorandum Decision of January 5, 1976.

20. This decree shall remain in effect until further order of this Court.