UNITED STATES of America, et al., Plaintiffs-Appellees,

v.

CITY OF CHICAGO, et al., Defendants-Appellees.

Appeal of Linda AUGUSTUS, et al.

and

Appeal of Suzanne BAKER, et al., Petitioning-Intervenors.

Nos. 85–2027, 85–2056.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 21, 1986.

Decided July 7, 1986.

As Modified on Denial of Rehearing and Rehearing En Banc Aug. 27, 1986.

Kenneth N. Flaxman, Chicago, Ill., for petitioning-intervenors.

Frank Allen, Jr., Corp. Counsel, Chicago, Ill., for appellees.

Before CUMMINGS, Chief Judge, BAUER and CUDAHY, Circuit Judges.

CUDAHY, Circuit Judge.

This consolidated appeal concerns two sets of parties that seek to intervene in the longstanding litigation involving the hiring and promotion practices of the Chicago Police Department. In 1976, the district court for the Northern District of Illinois found that these practices discriminated against black and Hispanic men and against women. New tests have since been offered. The group of proposed intervenors led by Suzanne Baker (the "Baker petitioners") are 34 black and white women and white men who passed the 1981 hiring exam but have not been called to the assessment center—the second stage of the hiring process. They seek to enjoin the City from offering a new patrol officer's test until all those who passed the 1981 exam have been hired. The group of petitioners led by Linda Augustus (the "Augustus petitioners") are minority women who passed the 1979 sergeant's exam but have yet to be promoted. In 1982, the district court determined that minority women would be counted as women and not as racial minorities for purposes of the promotion quotas designed to remedy the disparate impact of the 1979 sergeant's exam. The Augustus petitioners claim that this classification system has prevented minority women from being promoted and has delayed the remedying of racial discrimination. The district court denied both groups' petitions to intervene.

In order to understand the current posture of the litigation it is important first to have some understanding of its background.

### A. Hiring Facts

In 1973 the United States filed suit against the City of Chicago to correct discriminatory hiring and promotion procedures in the Police Department. The government case was consolidated with a pending case brought by black police officers (the "Robinson plaintiffs"). Various parties were later allowed to intervene. The district court first issued a preliminary injunction [1] and entered a final decree on February 2, 1976 finding the Police Department guilty of race and sex discrimination in violation of Title VII, 42 U.S.C. § 2000e et seq. *United States v. City of Chicago,* 411 F.Supp. 218 (N.D.Ill.1976). The court found that the 1971 patrol officer's exam, upon which the hiring roster was then based, had a disparate impact against minorities and women and was not shown to be job related. To correct the resulting imbalance, the court ordered that 42% of all future patrol officer vacancies be filled by black and Hispanic males and 16% by females. On appeal, this court upheld the finding of discrimination and the use of quotas. This court, however, reversed the district court's determination that the City could disregard the existing eligibility roster once the minority and female quotas had been met. *United States v. City of Chicago,* 549 F.2d 415 (7th Cir.), *cert. denied,* 434 U.S. 875, 98 S.Ct. 225, 54 L.Ed.2d 155 (1977).

In 1975 the City offered a new exam. In August 1976, the City submitted to the district court a new roster based on this test. The district court found this roster to be fairly representative of the pool of applicants. The court therefore suspended the

mandatory hiring quotas it had ordered earlier.[2] 420 F.Supp. 733, 736 (N.D.Ill. 1976), *aff'd,* 567 F.2d 730 (7th Cir.1977), *cert. denied,* 436 U.S. 932, 98 S.Ct. 2832, 56 L.Ed.2d 777 (1978). Between 1976 and 1981, the hiring of patrol officers proceeded without the use of mandatory quotas.

Another exam was offered in 1981. The City proposed and the district court approved treating this exam as a "pass-fail" test and hiring passing applicants according to a quota of 34% white males, 35% minority males and 31% females.[3] No party sought to intervene to protest these hiring goals. The Baker petitioners were part of the 3,000 people who had passed the 1981 exam but remained on the notification list to be called to the assessment center. Before this court, the Baker petitioners argue that they did not seek intervention earlier because they expected to be called eventually. They argue that they intervened as soon as they learned the City planned to discard the 1981 exam, that the City apparently seeks to offer a new exam only because the 1981 eligibility list has been exhausted of minorities and that, in light of the Supreme Court's decision in *Firefighters Local Union No. 1784 v. Stotts,* 467 U.S. 561, 104 S.Ct. 2576, 81 L.Ed.2d 483 (1984), any future use of quotas may be unconstitutional.

### B.

The 1976 district court decision also found the Police Department's 1973 exam for promotion to sergeant to have a disparate impact on minorities. That court therefore ordered that future promotions should be fairly representative of the labor force and imposed a mandatory quota for minorities of 40%. *United States v. City of Chi-*

---

1. *United States v. City of Chicago,* 385 F.Supp. 543 (N.D.Ill.1974).

2. The City submitted a roster that was 50.2% white male, 25.8% black and Spanish surnamed, and 23.9% female compared to an applicant pool that was 45.4% white male, 28.6% black and Spanish surnamed and 25.9% female.

3. 16,733 individuals took the 1981 exam. Of those, 61% were black and Hispanic while 39% were white or others. 41% of blacks and Hispanics passed the exam while 59% of the white and other group passed. Because of this disparity, the City sought the use of a quota.

*cago*, 411 F.Supp. 218.[4] On appeal, this court ruled that after the 40% quota had been achieved, further promotions should be made in rank order from the 1973 list. *United States v. City of Chicago*, 549 F.2d 415 (7th Cir.), *cert. denied*, 434 U.S. 875, 98 S.Ct. 225, 54 L.Ed.2d 155 (1977).

In 1979, the City abandoned the 1973 list and offered a new promotion exam. After the 1979 list was prepared, the City and the Department of Justice asked the district court to permit promotions to be made from the test at approximate parity with the applicant pool, which would reduce the minority quota from 40% to 25%. Additionally, it asked the district court to create a separate 10% quota for female promotions. The district court refused to modify the decree. On appeal, this court, *en banc*, reversed, determining that since the original promotional goals had been largely achieved[5], the minority quota should be reduced from 40% to 25%. The court also directed the district court to consider the desirability of a female quota since the female membership in the officer force had risen. *United States v. City of Chicago*, 663 F.2d 1354 (7th Cir.1981).

On remand, the district court adopted a five percent quota for all women. The court determined that black women were to be counted only on the female list and were to be stricken from the black list. The court viewed this arrangement as temporary until a full evidentiary hearing could be held on the validity of the 1979 sergeant's exam. The hearing was held in September 1983. In April 1984, the district court held the exam to be invalid and ordered that the 25% minority and 5% female quotas be kept in force.

The Augustus petitioners moved to intervene in November 1984. In February 1985, they filed an amended motion stating that since both black males and females scored lower than white females on the 1979 exam but black females are not counted as blacks, the quota arrangement fails to correct the racially discriminatory effect of the 1979 exam. They claim that had they been classified as blacks, two more black females would have been promoted.

In a hearing in June 1985, Judge Prentice H. Marshall denied both parties' petitions to intervene. Judge Marshall determined that the interests of both parties had already been represented in the litigation and that they were seeking to reargue issues already concluded. He also determined that since the promotion and hiring lists had been in place for several years, the parties' motions were untimely.[6]

## I.

Petitioners did not specify before the court below whether they were seeking permissive intervention under Federal Rule of Civil Procedure 24(b) or intervention as of right under Fed.R.Civ.P. 24(a)(2). The district court apparently considered the petitions under Rule 24(a)(2). Four requirements must be met before intervention will be granted as of right:

The application must be timely. The intervenor must show an interest relating

---

**4.** Initially, the district court did not set a separate promotional quota for females. However, it stated that "an appropriate goal for promotion of females to the rank of sergeant will be considered, upon appropriate motion when a sufficient number of females are available in the patrol officer rank." 411 F.Supp. at 251.

**5.** The court found that the percentage of minorities in the sergeant force reasonably represented the percentage of minorities in the patrol officer force. *United States v. City of Chicago*, 663 F.2d at 1361 n. 19.

**6.** Briefs in opposition to the Baker and Augustus petitioners' motions to intervene have been filed by the City of Chicago and the defendant-appellee Fraternal Order of Police. The Robinson plaintiffs have filed a brief opposing the Baker petitioners but taking no position on the Augustus petitioners' motion. The United States, as plaintiff-appellee, has filed a brief opposing the Augustus petitioners' motion but supporting that of the Baker petitioners. The United States argues that the Baker petitioners raise a new issue—that it is unconstitutional to discard a hiring list because it has been exhausted of minority males. The United States also contends that the Baker petitioners could not have known their interests were jeopardized until the City announced in 1985 that it would jettison the 1981 list and claims that allowing the Baker petitioners to intervene would not prejudice other parties to the suit.

to the property or transaction which is the subject of the action. The intervenor must show that the disposition may as a practical matter impair or impede the intervenor's ability to protect that interest. And, the intervenor must show that the interest is not adequately represented by existing parties.

*United States v. 36.96 Acres of Land*, 754 F.2d 855, 858 (7th Cir.1985), *cert. denied*, — U.S. ——, 106 S.Ct. 1956, 90 L.Ed.2d 364 (1986). Failure to satisfy even one of these requirements is sufficient to warrant a denial of a motion to intervene as a matter of right. *Commodity Futures Trading Commission v. Heritage Capital Advisory Services*, 736 F.2d 384, 386 (7th Cir.1984).

Here, the district judge offered two grounds for denying the petitions to intervene. First, he determined that the petitioners' motions were not raised in a timely fashion. The purpose of the timeliness requirement is to "prevent a tardy intervenor from derailing a lawsuit within sight of the terminal." *United States v. South Bend Community School Corp.*, 710 F.2d 394, 396 (7th Cir.1983), *cert. denied*, 466 U.S. 926, 104 S.Ct. 1707, 80 L.Ed.2d 181 (1984). Therefore, "as soon as a prospective intervenor knows or has reason to know that his interests might be adversely affected by the outcome of the litigation, he must move promptly to intervene." 710 F.2d at 396.

Questions of timeliness are within the discretion of the district court and will be reversed only for an abuse of that discretion. *United States v. Kemper Money Market Fund, Inc.*, 704 F.2d 389, 391 (7th Cir.1983). Among the factors to be considered in determining whether a motion is timely are:

1) the length of the time the intervenor knew or should have known of his interest in this case, 2) the prejudice to the

original party caused by the delay, 3) the resulting prejudice to the intervenor if the motion is denied, and 4) any unusual circumstances.

*South v. Rowe*, 759 F.2d 610, 612 (7th Cir.1985).

Here, the Baker petitioners knew in 1982 that quotas would be imposed. They knew then that they would not be hired in rank order of their scores. In their brief before this court, they seem to concede that these facts gave them sufficient reason to seek intervention more than three years ago:

The Baker intervenors have had their rights violated for the past several years while they were being passed over for purposes of employment by those with lower scores solely on the basis of race when there was no proof ever presented that these same individuals were the victims of discrimination nor even that the test itself was discriminatory.

Baker Petitioners' Br. at 12–13.

The Baker petitioners argue that even though they knew that they might suffer from delays in hiring they did not seek intervention when the quotas were first announced because they thought they would ultimately be hired:

The intervenors did not seek intervention simply because there was no reason to. All had passed the exam and all had done well. Even though quotas might mean that some of the white male applicants might be called at a later point than otherwise they might have, it also meant that they were insured of becoming patrol officers at some point. Of course, the quotas assisted Suzanne Baker and the other female intervenors.

Baker Petitioners' Br. at 7–8. However, the Baker petitioners never state why they thought they were "insured" of being hired.[7] Nothing in the record indicates

---

**7.** The United States argues that the Baker petitioners' motion to intervene is timely because "they had no reason to expect that the list would be exhausted of black males *before* it was exhausted of white males and females." United States Br. at 24. Since white males, females and minority males appeared on the eligibility

list in roughly the same percentages, the United States argues, the Baker petitioners had reason to assume that no group would be exhausted before any other. But the fact that the Baker petitioners had some basis for assuming they would ultimately be hired does not justify their waiting until this assumption was proved wrong

that the City promised to hire all those named on the eligibility list. The Baker petitioners point to no case where a city was required to maintain an eligibility list until all names had been exhausted. On the contrary, this court's earlier decision in *United States v. City of Chicago*, 567 F.2d 730, 733 (7th Cir.1977), *cert. denied*, 436 U.S. 932, 98 S.Ct. 2832, 56 L.Ed.2d 777 (1978), should have alerted them that the City could and would periodically throw out an eligibility list. That they mistakenly assumed this would not happen to them does not entitle them to enter the lawsuit more than three years after the quotas had been imposed.

The Baker petitioners seem to concede that the City could discard an eligibility list because it is stale. *See* Baker Petitioners' Br. at 7. They contend, however, that "there was no argument below that the test was stale," *Id.*, and that "[t]he only argument was that the City had exhausted its quota of qualified Hispanic and Black male applicants and, hence, a new exam was required." This, they suggest, was an unconstitutional basis for discarding the list. They argue that they sought intervention as soon as they became aware of the City's intentions. However, nothing in the record suggests that the absence of minorities was the City's reason for discarding the 1981 list. Rather, in its Memorandum in Opposition to the Baker Petition to Intervene at 5 (N.D.Ill. May 21, 1985) the City argued "The City is authorized to remove eligibility lists which are no longer viable and the City has frequently removed stale eligibility lists in the past." While the attorney for the Robinson plaintiffs stated before the district court that the absence of minorities is a basis for discarding the list, *see* Transcript of Proceedings, Baker Petitioners' Appendix at 7, this represents the views of one group of plaintiffs in their suit against the City and cannot be read as the City's views. Moreover, even if the City *did* discard the list because it was exhausted of minorities, this would be con-

sistent with the dictates of the 1982 consent decree, which required a hiring ratio of 35% minority males, 34% white males, and 31% females. This ratio could not be complied with once the eligibility list was exhausted of minorities. To challenge the City's right to seek a new pool of minorities, then, necessarily involves a challenge to the legitimacy of the consent decree. As such, it is an issue that could have been raised when the consent decree was approved in June, 1982 and is now untimely.

Further, the Baker petitioners cannot overcome their tardiness by claiming that they did not appeal earlier because until *Firefighters v. Stotts*, 467 U.S. 561, 104 S.Ct. 2576, 81 L.Ed.2d 483, was decided by the Supreme Court they thought "any intervention arguing that quotas were unconstitutional would be a futile act." Baker Petitioners' Br. at 9. The shifting sands of case law and the odds of victory or defeat are not among the factors courts ordinarily weigh heavily in assessing timeliness. Therefore, we cannot say the judge abused his discretion in denying intervention. Moreover, *Stotts* was decided on June 12, 1984. The Baker petitioners did not file for intervention until May 6, 1985. They offer no explanation why, if they thought *Stotts* afforded them new rights, they waited almost one year to pursue them.

Similarly, Judge Marshall acted within his discretion in denying the Augustus petitioners' motion to intervene. After the results of the 1979 Sergeant's Exam were announced, they knew that there would be only a limited number of promotions and that their scores were low. Once the district court ruled in July 1980 that the City could keep in force the 1976 promotional quota for minorities but could not have a separate quota for females—the one proposed would have double-counted minority women—the Augustus petitioners knew that no specific allotment had been made for black women. This court reversed the district court's determination in 1981 and

---

to intervene. They knew their interests were compromised when the quotas for the 1981 exam were first introduced and the rank order-

ing of scores—which favored nonminorities and had a disparate impact against minorities—was disregarded.

directed the district court to "consider the desirability of an appropriate promotional quota for females, either to be counted separately from the minority quota, or, if appropriate, to be 'double-counted.'" *United States v. City of Chicago*, 663 F.2d at 1362. The Court of Appeals' decision thus specifically noted the alternative modes of treating minority women. And once this case was remanded, petitioners knew that the district court would issue a final ruling on the promotional status of minority women. This was the time when intervention would have been most appropriate, yet the Augustus petitioners waited over three years before seeking it.

Another important consideration in the timeliness calculus is the prejudice to the City and to aspiring police officers if the City cannot offer new tests. The 1981 hiring exam is now five years old. Under similar circumstances, when considering the 1972 eligibility roster, this court was dubious of the validity of a five-year-old test in providing appropriate persons for patrolman duty. *United States v. City of Chicago*, 567 F.2d at 734.[8] We think there might be serious problems in requiring the City to use a potentially stale test, particularly since the City Personnel Code requires keeping an eligibility list for only one year. City of Chicago Personnel Rule VII, Section 3(d). Additionally, thousands of individuals have been waiting more than four years for the chance to become patrol officers. The City has already announced that they will have an opportunity to take a new exam. To continue to keep the 1981 eligibility list in force would jeopardize their interests as well. This is particularly inequitable since nothing prevents those still on the 1981 eligibility list from taking the new exam.

## II.

Judge Marshall also found that the petitioners were raising claims that had been raised before and were adequately represented by other parties. He was not specific as to who represented these parties. However, there certainly appears to be some overlap, for example, between what the Baker petitioners would argue and what the United States has recently urged. For instance, the United States has already advanced the argument of the Baker petitioners that *Stotts* bars the further use of quotas. One party need not advance the identical argument of another in order to adequately represent its interests.

It is more difficult to see who represents the interests of black females. However, because Judge Marshall has been immersed in the issues of this case for more than a decade, and particularly in light of the parties' lateness in seeking intervention, we cannot reject Judge Marshall's view out of hand.

Finally, any argument that petitioners should obtain permissive intervention must also fail. Timeliness is also a factor under Rule 24(b), and under that rule, permissive intervention is within the district court's discretion. Because it was his opinion that the petitioners would disrupt the flow of the litigation and rehash old arguments, Judge Marshall denied their motions. That denial was within his discretion. *United States v. 36.96 Acres of Land*, 754 F.2d at 860.

We are aware that these proposed intervenors have waited a long time to be employed or promoted. We can understand their disappointment that present policies affecting the Police Department do not fa-

---

**8.** As the Court noted then:

The underlying reason for allowing the civil service commission to have wide discretion to determine whether an eligibility list should be cancelled was explained in *People ex rel. Erickson v. Sheehan*, 24 Ill.App.2d 43, 47, 163 N.E.2d 834, 836 (1960):

The policy behind this provision is to maintain an up-to-date register, the vitality of which may be guaranteed by the discretion placed in the commission to meet changing conditions and circumstances. Toward that end, the commission is authorized to strike a register which is no longer suitable to fulfill the function for which it was intended.

Here the list involved is more than five years old, thereby raising some questions as to its validity in providing appropriate persons for patrolman duty.

*U.S. v. City of Chicago*, 567 F.2d at 734.

vor their interests. Nonetheless we appreciate the Department's concerns for minimizing litigation and delay so that the ongoing operation of the Department will not be compromised.

For these reasons, the district court's denial of petitioners' motions to intervene is AFFIRMED.